Worthen, County Clerk, vs. Badgett et al.     Same vs. Faust et al.

WORTHEN, COUNTY CLERK, VS. BADGETT ET AL.
WORTHEN, COUNTY CLERK, VS. FAUST, ET AL.

1. SCHOOL TAX: *Levy of by County Court; Power, etc.*

The County Court has no power to levy a school tax independent of action on the part of the electors or officers of each school district for which the tax is levied; it can only cause to be placed on the tax books, and collected, such rates as are reported from the districts.

2. ————: *Same.*

Under the provision of the Revenue Act of April 28, 1873, a school tax of fifteen mills was authorized to be levied in the rural school districts. An act passed on the 29th of April, 1873, for the maintenance of a system of free schools, limited the amount to be levied in the rural districts for school purposes, to five mills; held, that there was an irreconcilable conflict between the two acts, and the latter being the last expression of the legislative will, must prevail over the former.

3. EXCESSIVE LEVY: *Effect of.*

An excessive levy vitiates the whole tax; and the court, upon a bill to enjoin, cannot treat as valid so much of the levy as is not in excess of the rate authorized by law.

4. STATUTES: *Passage of, etc.*

It is well settled that the courts will look behind the printed statutes to the legislative records, to ascertain whether an act, purporting to have been passed and approved by the Governor, was in fact passed in accordance with the forms and in the manner provided for by the Constitution.

5. ————: *Presumption in favor of legislative action.*

Where the House journal shows that an original bill was read a first and second time, and referred; that a substitute was reported and adopted in lieu of the original bill, and was read a third time and passed. but does not show the first and second reading of the substitute, it not affirmatively appearing to the contrary, the court will presume that the substitute was read three times as the Constitution requires.

6. ————.

The seventh section of an act entitled "An Act to authorize certain counties to fund their outstanding indebtedness;" approved the 29th of April, 1873, provided, that the bonds of any county named in the act, previously issued for the purpose of funding outstanding lawful indebtedness of the county, should be valid, held to be germain to the subject and purposes of the act, and embraced in its title.

Worthen, County Clerk, vs. Badgett et al.　Same vs. Faust et al.

7. COUNTY COURT: *How composed.*

The Constitution authorizes the justices of the peace to sit with the County Judge in levying taxes and making appropriations for the expenses of the county; in other matters the legislature cannot authorize the justices to sit with the County Judge, and an act attempting to do so is unconstitutional and void.

8. . COUNTY TAXES: *For public buildings.*

Where a County Court contracts for the building of a jail, and for that purpose levies a tax for county buildings, and after the tax book has gone into the hands of the collector the contract is rescinded; it is the duty of court to set aside the levy and stop the collection of the building tax, and if it fails to do it, any tax payer may enjoin its collection.

9. TAXES: *Penalty, etc.*

Under the provisions of an act of the legislature to suspend the sale of delinquent lands, approved the 16th of May, 1874, no penalty could be charged against lands upon which the taxes for the years 1872-3 were paid by the 20th of April, 1875. The act of February 22d, 1875, to suspend the collection of taxes for 1873-4, provided a penalty of 15 per cent. on the delinquent taxes; under the provisions of the latter act the owners of delinquent lands who failed to pay the taxes by the 20th of April, 1875, were required to pay the penalty of 15 per cent. for two years, upon the delinquent taxes legally charged against the lands.

10. TAX SALE: *For taxes of several years.*

When land is sold for the taxes of several years, it should not be sold separately for each year's taxes, but should be sold at one time for all the taxes charged against it.

11. ————: *To the State, illegal; Remedy.*

Where lands against which illegal taxes are charged, are sold to the State, the title therero vests in the State upon the making and recording of the certificate of conveyance by the County Clerk after the expiration of the time allowed for redeeming, after which the owners would have no remedy as against the State; they are therefore entitled to enjoin the clerk from making the certificate.

12. ————: *Terms upon which relief granted in equity.*

The owner of land seeking to set aside, or restrain a sale thereof for illegal taxes, must pay the legal assessments, if any, and the penalty thereon, before he can obtain relief in equity

APPEAL from *Pulaski* Chancery Court.

Hon. JOHN R. EAKIN, Chancellor.

*Henderson & Caruth,* for appellants.

*Brown* and *Collins, contra.*

32

ENGLISH, CH. J.:

These cases were argued and submitted on the same briefs. They involve the same principal questions, and may be disposed of by one opinion.

In the first case the bill was filed in the Pulaski Chancery Court, by Noah H. Badgett and wife, land owners and tax-payers of Pulaski County, for the benefit of themselves, and such other tax-payers whose lands were in the condition of theirs, as might think proper to make themselves parties, and claim the benefit of the relief prayed for by the bill.  Robert W. Worthen, Clerk of the County Court of Pulaski County, was made defendant, and the object of the bill was to enjoin him from making a certificate of conveyance to the State, etc., (under sec. 157 of Miller's Dig.,) of lands of the plaintiff, sold to the State by the Collector, on the 3d Monday of May, 1876, and succeeding days, for unpaid taxes, etc., assessed upon the lands for the years 1873, 1874, and 1875.  The bill was amended several times; and while pending, a number of persons whose lands or city lots had been purchased by the State, at the same tax sale, were made co-plaintiffs with Badgett and wife.

Worthen demurred to the bill, the demurrer was overruled; he filed an answer, to which plaintiffs demurred; the Chancellor sustained the demurrer, and rendered a decree in accordance with the prayer of the bill, from which Worthen appealed to this court.

In the second case the bill was filed in the same court, by John W. Faust and wife, and a number of other tax-payers, whose lands or city lots had been purchased by the State, at the tax sale above referred to; and the object of the bill was the same as that of the Badgett bill.  Worthen demurred to the bill, the Chancellor overruled the demurrer, and rendered a decree in accordance with the prayer of the bill; from which Worthen appealed to this court.

No complaint is made in either bill of any illegality in the State or city taxes assessed for the several years in question.   In the Badgett bill no complaint is made of illegality in the school district assessments ; but in the Faust bill it is alleged that the assessments made for school districts, in which the lands or lots of some of the plaintiffs were situated, were illegal and excessive. The objections made to the County assessments, and to the irregularities in the tax sale, are common to both bills.

## I.

We will first dispose of the objections made to the legality of the school district assessments in the Faust bill.

*First*—The bill alleges that on the 10th day of October, 1873, the Board of Supervisors, in addition to other taxes, assessed upon the taxable property listed for taxation, for school purposes in the School District of the City of Little Rock, and in districts Nos. 12 and 31, both in Ashley Township, and in districts Nos. 16 and 25, both in Eastman Township, for teacher's fund 10 mills, and for building fund 5 mills, and upon all of the other districts of the county 5 mills.

That on the 9th of October, 1874, the Board of Supervisors assessed a tax of 5 mills for school purposes in each district.

That at the October Term, 1875, of the County Court (which had been substituted by the present Constitution for the Board of Supervisors,) there was assessed for school purposes such amounts as appeared by the reports on file to have been voted in the several districts.

That the taxes assessed for school purposes for the year 1873 were illegal, because "no reports were filed of proceedings of any meetings of electors of the districts, nor were any reports filed by school trustees of the failures of school meetings, to fix amounts to be raised.   Nor were any estimates filed by any trustee of amount necessary to support a school for three months."

Worthen, County Clerk, vs. Badgett et al.     Same vs. Faust et al.

That the taxes assessed for school purposes in the year 1874 were also illegal, for the reason that "no reports of proceedings of electors fixing amounts to be raised, no reports of failures to hold such meetings, and no estimates of amounts were filed before the levy, or during the year."

No objection is made to the school levies for the year 1875.

The truth of the allegations of the bill, as to the levies made for school purposes for the years 1873 and 1874, being admitted by the demurrer, the taxes were held by the Chancellor to be illegal and void, because the Board of Supervisors had, as alleged, no reports from the school districts upon which to base the levies, and cause them to be placed upon the tax books; and in this we concur with the Chancellor.

By the statutes in force in 1873-4, the electors of each rural school district were authorized to hold an annual school meeting, elect a trustee, etc., and to determine by a majority vote what amount of money should be raised by tax on the taxable property of the district, sufficient, with the public school revenues apportioned to the district, to defray the expenses of a school for three months, or for any greater time they might decide to have a school taught during the year; and it was made the duty of the trustee to report the amount voted to the Board of Supervisors, and of the Board to levy the tax, etc. Gantt's Dig., secs. 5419, 5422, etc.

In cities and towns constituting school districts, it was made the duty of the board of directors, chosen by the electors, to fix the rate of tax, and report it to the Board of Supervisors, to be placed upon the tax books. Ib., secs. 5515 to 5537.

The Board of Supervisors had no power to levy a school tax independent of the electors or officers of the school districts. It could only cause to be placed on the tax book, and collected,

such rates as were reported from the districts. *Murphy et al.*
v. *Harbison*, 29 Ark., 340 ; *Cairo and Fulton R. R. Co.* v. *Parks*,
M. S.

If in fact the Board of Supervisors levied the district school
taxes for the years 1873 and 1874, in the absence of reports from
the school districts, as alleged by the bill, and admitted by the
demurrer, the levies were totally void.

*Second*—There is a further objection to the district school levies
for the year 1873, upon which the Chancellor gave no positive
opinion, but which it is proper for us to settle, in order that ap-
pellees may know what taxes they must pay, should they find it
necessary and choose to redeem their lands or lots.

The bill alleges that the levies for the Little Rock District,
including the lots of plaintiffs, and in districts numbered 1, 12,
25 and 31, in which their lands are chiefly situated, were exces-
sive.

We find from an authenticated copy of the order of the Board
of Supervisors fixing the rates for the year 1873, which is made
Exhibit C to the Faust bill, that the levies for the school dis-
tricts were as follows:

For the Little Rock District, for the purpose of building
school houses, twenty-five cents on each one hundred dollars val-
uation, and, for paying the salaries of teachers, fifty cents on
each one hundred dollars.

For District No. 1 (Fourche), for teachers' fund, fifty cents on
the one hundred dollars.

It seems that districts numbered 21 and 22 were also called
Fourche, for each of which fifty cents on the one hundred dol-
lars was levied.

In each of the districts numbered 2 (Big Rock); 12 (Ashley);
16 (Eastman) ; 25 (Eastman) ; and 31 (Ashley), ten mills on the
one dollar were levied for teachers, and fifty cents on the one
hundred dollars for building.

In the other districts the levies appear not to have exceeded fifty cents on the one hundred dollars.

Thus it seems that the Board of Supervisors levied for school purposes in 1873, seven and a half mills to the dollar on the Little Rock District, and fifteen mills to the dollar on the rural districts numbered 2, 12, 16, 25 and 31 respectively.

By sec. 148, of the Revenue Act of 1873, which was approved by the Governor and went into effect on the 28th of April of that year (Acts of 1873, p. 367), the Board of Supervisors of each county was authorized to levy for any one year: "For the support or maintenance of public schools in any school district in such county (other than the cities or towns), such rate as may be determined upon by the qualified electors of such district, in the manner prescribed by law, not exceeding ten mills on the dollar for teachers' fund, and five mills on the dollar for school house fund; and, for the support or maintenance of public schools in any city or town in such county, constituting a school district, such rate as may be determined on by the board of directors as prescribed by law, not exceeding seven and one-half mills on the dollar for school house fund." See Gantt's Digest, sec. 5058.

But by sec. 21, of "An Act to maintain a system of free common schools for the State of Arkansas," which was approved by the Governor and went into effect on the 29th of April, 1873 (Acts of 1873, p. 399 to 422), it was provided: "That all taxes voted for school purposes by any school district, shall be levied by the County Court (afterwards Board of Supervisors) at the same time the county taxes are levied, and shall be collected in the same manner as county taxes are collected, at the same time and by the same persons, and be paid into the county treasury, there to be kept subject to disbursement on the warrant of the trustee: Provided; that no tax for purposes aforesaid greater than one-half ($\frac{1}{2}$) of one per cent. on the assessed value of the

taxable property of the district shall be levied." See Gantt's Digest, sec. 5422.

This section, from the language employed, and its context, manifestly applies to the several school districts and not to cities and towns constituting school districts. See the whole of ch. 120., Gantt's Dig.

As to the amount of tax that may be voted in the several districts for school purposes, there is an irreconcilable conflict between sec. 21 of the Act of April 29, 1873, and sec. 148 of the Revenue Act of April 28, 1873, and the former act being the last expression of the legislative will, must prevail over the latter.

If therefore the electors of school districts numbered 2, 12, 16, 25, and 31, in fact voted a tax in the year 1873, at the time and in the manner prescribed by law, of fifteen mills on the dollar (equal to one and a half per cent.), and if the trustees of the district in fact duly reported the matter to the Board of Supervisors, it had no legal power to levy the rate voted, because it was three times the amount authorized by law, and the excess was certainly void, and no property owner was obliged to pay it.

*Third*—But the further question arises, can the court, on a bill to enjoin, treat as valid so much of the tax for any school district as was not in excess of the amount authorized by law, though an excessive levy may vitiate a tax sale or deed?

The tax is self-imposed by the electors of the district. They may vote it or not, as they may choose. The law authorizes, but does not compel them to vote the tax. It regulates the time and manner of voting, and limits the rate that may be voted for the protection of the minorities, etc. If the electors of a district vote a tax of fifteen mills for school purposes, they might seem thereby to express their willingness and intention to vote as much as five mills, for the greater includes the lesser amount.

Worthen, County Clerk, vs. Badgett et al.     Same vs. Faust et al.

But the act of voting fifteen mills when the law prohibits the electors from voting more than five, is illegal, and it is difficult to see how the vote can be split, and part of it be held valid and the rest bad.

Mr. Cooley says a levy may be excessive from imposing more for a lawful purpose than is permitted, and in such case the tax is wholly void. Cooley on Taxation, p. 296.

The cases cited by him are mostly from the New England States, where taxes are voted by the electors of the towns for school and other local purposes, and they invariably sustain the text.

In *Libby* v. *Burnham et al.*, 15 Mass., 147; Parker, Ch. J. said : " It is impossible to distinguish between that part of a tax which might have been rightly assessed and that for which no authority is given, so that the assessment should be valid for one part and void for another."

And this is the rule asserted in all the cases which we have been able to find in point.

*Stetson* v. *Kempton et al.*, 13 Mass., 283 ; *Hubbard* v. *Brainard*, 35 Conn., 568; *First Ecclesiastical Society of Hartford* v. *Town of Hartford*, 38 Conn., 274 ; *Huse* v. *Merrian et al.*, 2 Greenleaf, 345, marg. 376.

In *Drew* v. *Davis*, 10 Vermont, the court said : " Had the illegal portion of the tax been laid and assessed as a district tax, there would have been no difficulty in enforcing other taxes lawfully laid; but, unfortunately, the tax laid for an object not within the corporate powers of the town, and which the corporation could not legally impose, was blended, in the outset, by the vote enacting it, with taxes for legitimate purposes, and was so assessed. It was impossible for the court to discriminate between that part of the tax which could be legally laid and that which could not. Hence, the whole proceeding was void, and

the whole matter rested where it would have done, had no vote been taken imposing a tax for any purpose."

So in *Johnson* v. *Colburn*, 36 Vermont, 695, the court said, briefly: "If any part of the tax is void, it being entire, the whole is void."

See also *Gerry* v. *Inhabitants of Stoneham*, 1 Allen, 319; *Wells* v. *Burbank*, 17 New H., 393; *Case* v. *Dean et al.*, 16 Mich., 32.

We conclude this branch of the case, by recapitulating, that according to the allegations of the Faust bill, admitted to be true by the demurrer, the district school taxes charged upon the lands and lots of appellees, for the years 1873 and 1874, were illegal, because levied by the Board of Supervisors in the absence of any reports from the school districts; and that the tax levied upon several of the rural districts for 1873, indicated above, was also illegal and void because excessive; but that the bill does not question the school tax levied upon any of the districts for the year 1875.

## II.

We will next consider the objections made in common by the two bills to the county taxes charged upon the land and lots of appellees for the several years 1873-4-5, and for which, with other taxes, they were offered for sale and purchased by the State.

Authenticated copies of the orders of the Board of Supervisors and County Court making the levies complained of, are made exhibits to the bills, and are copied below:

### COUNTY TAXES OF 1878.

On the 10th of October, 1873, the Board of Supervisors levied and ordered to be collected the following county taxes for that year:

1. For ordinary county purposes fifty cents on each one hundred dollars worth of taxable property of the county.

2.   For the paying outstanding indebtedness of the county, twenty cents on each one hundred dollars valuation.

3.   For bridge purposes, ten cents on each hundred dollars valuation.

4.   For the laying out and opening roads, ten cents on each one hundred dollars valuation.

5.   For the support of the poor, thirty cents on each one hundred dollars valuation.

6.   For the erection of buildings, thirty-five cents on each one hundred dollars, etc.

7.   For the payment of interest on the funded debt, forty-five cents on each one hundred dollars valuation.

### COUNTY TAXES OF 1874.

On the 9th of October, 1874, the Board of Supervisors levied and ordered collected the following county taxes for that year:

1.   For ordinary county purposes the sum of five mills on each one dollar's worth of taxable property of the county.

2.   For bridge purposes, one mill, etc.

3.   For laying out and opening roads, one mill, etc.

4.   For the support of the poor, three mills, etc.

5.   For building purposes, two and one-half mills on the dollar, etc.

6.   For payment of the interest on the funded debt, four and one-half mills on the dollar, etc.

7.   "For United States judgment, two and one-half mills on each one dollar's valuation; to pay a certain judgment recovered in the United States Circuit Court for the Eastern District of Arkansas, at the April Term, 1873, by James C. Kinzey against Pulaski County for the sum of $24,218.50, and interest thereon at the rate of 6 per cent. per annum and costs of said suit, a tax of two and one-half mills on the dollar of the valuation of the taxable property of said county, is hereby levied out of the

Worthen, County Clerk, vs. Badgett et al.    Same vs. Faust et al.

amount allowed by law to be levied for ordinary purposes, to be collected and paid only in United States currency, which said tax is levied in obedience to a peremptory mandamus issued out of the United States Circuit Court upon the petition of the said James C. Kinzey against said county, and directed to the Board of Supervisors, to levy so much and such part of the rate per cent. allowed by law to be levied upon the taxable property of said county for ordinary purposes not to exceed three mills on the dollar of said valuation, as would be sufficient to pay off and satisfy said judgment, interest and costs, as well as the cost adjudged to said Kinzey in said proceedings, wherein said writ of mandamus was issued, and to cause the same to be collected in United States currency and paid over to said James C. Kinzey, or his attorney of record, in satisfaction of said judgment interest and costs."

This is an awkward entry, but it is so written.

COUNTY TAXES FOR 1875.

At the October Term, 1875, the County Court levied and ordered collected the following county taxes for that year:

1. For general county purposes five mills on each one dollar valuation of the assessed value of the property of the county, which value is equal to the sum of $9,860,335.34, making the amount of said levy equal to the sum of $49,301.67, which said sum, or any part thereof, shall in no instance be received by the collector, and he is hereby commanded and instructed not to receive the same, in any county warrants issued prior to October 30th, 1874; and it is further ordered that out of the said levy of $49,301.67, the sum of $36,975.25 is hereby appropriated towards the payment of the general expenses of the county.

2. For the payment of outstanding indebtedness contracted before the adoption of the Constitution of 1874, viz: 30th October, 1874, and payable only in United States currency, *five mills* on each one dollar valuation, to be divided as follows, to-wit:

(*a*)    To pay interest on bonds to be issued in lieu of county bonds issued in 1871, 1873 and 1874, and bonds to be issued in lieu of county warrants and unliquidated claims issued prior to or on the 30th day of October, 1874, two mills on each one dollar of the above valuation, payable only in United States currency, or coupons of said bonds due and unpaid except such coupons as may become due on July 1st, 1876, which shall be received by the collector for the taxes of 1875, which is equal to the sum of $19,720.07, but of which sum the amount of $14,790.51 is hereby appropriated to the aforesaid purpose.

(*b*)    To pay a judgment rendered in the United States Circuit Court for the Eastern District of Arkansas, April 15th, 1875, in favor of Valentine Frost, three-fourths of one mill on each one dollar of the above valuation.

(*c*)    To pay a peremptory *mandamus* of the United States Circuit Court for the Eastern District of Arkansas, ordering the payment of a certain judgment against Pulaski County in favor of the Union and Planters' Bank of Memphis, Tenn., two mills on each one dollar of the aforesaid valuation.

(*d*)    To pay the interest on bonds issued to the Memphis and Little Rock Railroad, and interest on bonds issued in 1868, to fund outstanding indebtedness, one-fourth of one mill on each one dollar of the above valuation, which levy amounts to the sum of $2,465.08, and out of which sum there is hereby appropriated the sum of $1,848.81 for the payment of said interest, etc.

FIRST—FUNDED DEBT, COUNTY BONDS, ETC.

The bills allege that the seventh item of the levy for 1873, of four and a half mills to pay interest on the funded debt; and the sixth item of the levy of 1874 of four and a half mills for the same purpose; and the two mills in the levy of 1875 (item 2, division (*a*), to pay interest on bonds to be issued, etc., were unauthorized by law, and void.

Worthen, County Clerk, vs. Badgett et al,     Same vs. Faust et al.

In the eighth specification to the first amendment of the Badgett bill it is alleged that the levies of *four and a half mills* in 1873, and of *four and a half mills* in 1874, were for the purpose of raising funds to pay interest on bonds of Pulaski County issued during the years 1871, 1873 and 1874, without authority of law and void.

In the second amendment of the bill, it is alleged that in the year 1871, the County Court of Pulaski County authorized the Judge and clerk thereof to issue bonds of said county for the purpose of taking up and funding the outstanding debt of the county. That, in pursuance thereof, the said Judge and clerk during that and the succeeding year, executed and delivered to divers persons a large number of papers purporting to be bonds, amounting, as near as could be ascertained, to $22,700. That these bonds were issued without authority of law, and were void. That they were not cured by the Act approved 29th of April, 1873, entitled "An Act to authorize certain counties to fund their outstanding indebtedness," because said act was not constitutionally passed, embraced more than one subject, and the matter contained in its seventh section was not embraced by its title.

That during the years 1873 and 1874, the Board of Supervisors of Pulaski County, professing to act by virtue of the Act of 29th of April, 1873, issued certain other papers, purporting to be bonds of said county, amounting to $286,150.00 principal, which were outstanding. That said bonds were void, because the act under which they were issued was never a law of the State.

That on the 7th of February, 1873, a bill was introduced into the House of Representatives for "An Act to allow County Courts to fund their warrants when there is no money in the Treasury to pay the same." That on that day said bill was read a first and second time, and referred to the committee on ways and

means.    That on a subsequent day, said committee reported a substitute for the bill, to be entitled "An Act to allow counties and municipal corporations to fund their outstanding indebtededness," which was read and, with the original bill, referred back to the same committee.    That on the 18th of April, the committee reported another substitute, and recommended its passage. That the report was adopted, and the substitute that day reported was at once placed on its third reading and final passage; but was never read three times, as required by the Constitution, and hence did not become a law.

A transcript of so much of the House Journal as relates to the bill and substitutes, or purporting to be such, from the office of the Secretary of State, is made an exhibit.

It is alleged that the last substitute reported by the committee, and pretended to have been passed, was an entirely different bill in title and scope, from the bill first introduced.

That during the year 1875 and 1876, the County Judge and clerk executed and delivered to various persons, papers purporting to be bonds of Pulaski County, of which there were outstanding about $112,600.

That these bonds were issued under An Act, approved March 5th, 1875, which was null and void, because the General Assembly had no power, under the Constitution of 1874, to confer upon a body composed of the justices of the peace and County Judge, as was attempted in said act, authority to act in the matter of issuing said bonds, and hence the bonds were void.

That the levy of two mills on the dollar for the year 1875, "to pay interest on the bonds to be issued in lieu of county bonds issued in 1871, 1873 and 1874, and bonds to be issued in lieu of county warrants and unliquidated claims issued prior to or on the 30th day of October, 1874," was void, because levied to pay interest on bonds that were void for the reasons above stated.

Worthen, County Clerk, vs. Badgett et al.    Same vs. Faust et al.

That the levy of four and a half mills for the year 1873, and of a like amount for the year 1874, to pay interest on the funded debt, was void because made to pay interest on said bonds illegally issued during the years 1871, 1873 and 1874. That there was no other funded debt of the county to which the levies could apply, etc.

Thus it will be seen that this branch of the cases involves the validity of "An Act to authorize certain counties to fund their outstanding indebtedness," approved 29th of April, 1873 (Acts of 1873, p 466); and of "An Act to authorize the several counties in this State to fund their outstanding indebtedness," approved March 6th, 1875 (Acts of 1874-5, p. 254).

The Chancellor held the former act valid, and sustained the levies made in 1873 and 1874 to pay interest on bonds issued under it; and pronounced the latter act void, and consequently the two mills levy made in 1875, to pay interest on bonds issued under it illegal.

As to the Act of 29th April, 1873, the transcript from the House Journal made an exhibit to the Badgett bill, fails to show that the bill for the act was passed in the House of Representatives before it went to the Senate. But on a personal examination of the House Journal, we find that the bill was passed on the 18th of April, by a majority vote, and the yeas and nays entered on the journal. But the question is still left, was the bill read three times as required by the Constitution of 1868, in force when it was passed?

The House Journal shows that on the 4th day of February, 1873, Mr. Corbell, in accordance with previous notice, introduced a bill (H. B., 124) to be entitled "An Act to authorize County Courts to fund outstanding warrants, when there is no money in the Treasury to pay the same," which was read a first time, and, by unanimous consent, under a suspension of the

rules, the bill was read a second time by title, and, on motion of Mr. Neal Brown, the usual number of copies were ordered printed for the use of the House and the bill referred to the committee of ways and means.

On the 7th of April, 1873, Mr. Warwick, from the committee of ways and means, to whom was referred the bill of the House (H. B., 124), entitled An Act, etc. (copying the title as above), reported the same and recommended a substitute therefor, entitled "An Act to authorize counties and municipal corporations to fund their outstanding indebtedness." The report of the committee was adopted, and the substitute was accordingly adopted in lieu of the original bill, and, by unanimous consent, on motion of Mr. Warwick, the bill was read a third time and placed upon its passage. Before the vote was called, Mr. Sumpter moved that the bill lie on the table subject to call, which was not agreed to. After debate, Mr. White moved that the bill be recommitted to the committee of ways and means. After debate, Mr. Reid, at 9 o'clock and 9 minutes P.M., moved that the House adjourn, which was not agreed to. The question being on the motion that the substitute for the bill of the House (H. B., 124) entitled "An Act to authorize counties and municipal corporations to fund their outstanding indebtedness," be recommitted to the committee of ways and means, after debate, Mr. Turner moved the previous question, which was seconded, and the main question ordered, viz: shall the substitute bill be recommitted to the committee of ways and means? Mr. Beasley asked for the yeas and nays. The question being put, it was decided in the affirmative, yeas 34, nays 28, etc. So the bill was recommitted to the committee on ways and means.

On Friday, 18th of April, 1873, Mr. Warwick from the committee on ways and means, to whom was referred the bill of the House, together with a substitute therefor (H. B. 124), entitled

Worthen, County Clerk, vs. Badgett et al. . Same vs. Faust et al.

" An Act to authorize County Courts to fund outstanding war-rants when there is no money in the Treasury to pay the same," reported the same, and recommended a substitute therefor, en-titled "An Act to authorize certain counties to fund their outstanding indebtedness." The report of the committee was adopted, and the substitute was accordingly adopted in lieu of the original bill, and on motion of Mr. Corbell the bill was read a third time and placed upon its passage. Pending the reading of the bill, the hour of ten o'clock and 45 minutes A. M. having arrived, being the hour set for the consideration of the bill of the House (H. B. 348) etc., on motion of Mr. Coit the consider-ation of the special order was postponed for considering and disposing of the pending business. * * * The House having resumed consideration of the substitute for the bill of the House (Sub. H. B. 124) entitled "An Act to authorize certain counties to fund their outstanding indebtedness," and the reading of the bill being concluded, Mr. J. M. Murphy moved the previous question, which was seconded, and the main question ordered, viz.: shall the bill pass? The question being put, it was decided in the affirmative, yeas 48, nays 19, not voting 15, (then follow the yeas and nays) so the bill was passed.

On examination of the Senate Journal we find the following entries :

On the 19th of April, 1873, a message was received from the House of Representatives, by Henry M. Cooper, clerk, inform-ing the Senate that the House had passed substitute to H. B. 124, entitled "An Act to authorize certain counties to fund their out-standing indebtedness."

On the same day the bill was taken up in the regular order of business, and read the first time, and under a suspension of the rules, read the second time by title and referred to the committee on finance.

33

On Monday, April 21st, 1873, Senator Clayton, as chairman of the committee on finance, presented the following report:

"Mr. President—Your Committee on Finance to whom was referred substitute for House Bill No. 124, have had the same under consideration, and recommend the passage of the same with the following amendments : Insert in first section after the word ' Van Buren ' the word ' Crawford.' CLAYTON, chairman."

Which was read and received.

On the 28th of April, 1873, Senator Clayton called up substitute for House Bill, No. 124, entitled "An Act to authorize certain counties to fund their outstanding indebtedness ;" and the question occurring upon the adoption of the amendments recommended by the committee, the amendments were adopted. The bill as amended was then read the third time by title and placed upon its final passage. The question being : shall the bill pass? It was decided in the affirmative, yeas 17, nays 4, (here the yeas and nays are recorded) so the bill passed.

The following further entry appears in the House Journal.

*April 23, 1873.*

"A message from the Senate by Mr. Orrick, their secretary, viz.:

"SENATE CHAMBER, *April 23, 1873.*

"Mr. Speaker—I am instructed by the Senate to inform your honorable body that the Senate have passed substitute for H. B. 124, entitled "An Act to authorize certain counties to fund their outstanding indebtedness ;" with the accompanying amendments, and ask your concurrence therein."

(Here follow entries relating to other business, and then :)

" On motion of Mr. Kingston, the House proceeded to reconsider the substitute for the bill of the House (Sub. H. B. 124), entitled 'An Act to authorize certain counties to fund their outstanding indebtedness,' together with Senate amendments thereto.

Worthen, County Clerk, vs. Badgett et al.      Same vs. Faust et al.

(These amendments were taken from the files of the House for
the use of the committee on enrolled bills, and not returned—
*Journal Clerk*.)   Mr. Kingston moved that the House concur in
the Senate amendments.   The question being put, it was decided
in the affirmative, yeas, 40, nays, 22, not voting 20.   Those who
voted in the affirmative are * * * *   Those who voted in the
negative * * * *   Those absent * * * *   So the amendments
were concurred in."

Although where an act appears in a statute book, purporting
to have been approved by the Governor, and published by
authority of law, the presumption is that it was regularly passed,
and the courts ordinarily do not look beyond its face, yet it is
well settled that courts can, and, if necessary, will look behind
the printed statute, to the legislative records, to ascertain whether
it was in fact passed in accordance with the forms and in the
manner prescribed by the Constitution, and such has been the
practice of this court.   *Burr & Co.* v. *Ross & Leitch,* 19 Ark.,
250 ; *English* v. *Oliver, Collector,* 28 Ark., 321 ; *Knox* v. *Vin-
sant,* 27 Ark., 278-9 ; *State* v. *Little Rock, M. R. & Texas R. R.
Co.,* 31 Ib., 716 ; *Loftin* v. *Watson,* Supplemental Opinion M. S.;
*Jones* v. *Hutchinson,* 43 Ala., 723 ; Cooley's Con. Lim., 135.

Sec. 16, art. v. of the Constitution of 1868, in force when the
act in question was passed, provides that : " Each House shall
keep a journal of its proceedings, and publish the same, except
such parts as may require secrecy:   The yeas and nays of the
members of either House, upon any question, shall be entered
on the journal at the request of five members, etc."

Judge Story, commenting on a similar clause of the Constitu-
tion of the United States, said : " The object of the whole clause
is to insure publicity to the proceedings of the legislature, and a
correspondent responsibility of the members to their constituents.
And it is founded in sound policy and deep political foresight.

Intrigue and cabal are thus deprived of some of their main resources, by plotting and devising measures in secrecy. The public mind is enlightened by an attentive examination of public measures; patriotism, and integrity and wisdom obtain their due reward; and votes are ascertained, not by vague conjecture, but by positive facts." 1 Story on Constitution, sec. 839.

The Constitution expressly requires some matters to be entered upon the journals, as for examples, the yeas and nays, when requested by five members, art. v., sec. 16; the votes in elections by either house, or the two houses, sec. 16; the yeas and nays on the final passage of bills, sec. 21; the objections of the Governor on his refusal to approve a bill, and the votes thereon, sec. 35; proposed amendments to the Constitution, with the yeas and nays taken thereon, sec. 1, art. xiii., etc. But there is no general provision directing what shall be entered on the journals, other than that implied in the language: "Each house shall keep a journal of its proceedings, and publish the same, except such parts as may require secrecy."

Sec. 21, art. v., provides: "Every bill and joint resolution shall be read three times on different days in each house, before the final passage thereof, unless two-thirds of the house where the same is pending shall dispense with the rules. No bill or joint resolution shall become a law without the concurrence of a majority of all the members voting. On the final passage of all bills the vote shall be taken by yeas and nays, and entered on the journal."

The Constitution does not require the journal to show the three readings of the bills on different days, or the suspension of the rules by the requisite number of votes, but it is, no doubt, the better parliamentary usage, and more in accordance with the intention of the Constitution requiring a journal of the proceedings to be kept, that this should be done; and we are not

disposed to sanction or encourage looseness on the subject. But the journal must show that, on the final passage of a bill, the vote was taken by yeas and nays, and entered on the journal.

Mr. Cooley says: "Each house keeps a journal of its proceedings, which is a public record, and of which the courts are at liberty to take judicial notice. If it should appear from these journals that any act did not receive the requisite majority, or that in respect to it the legislature did not follow any requirement of the Constitution, or that in any other respect the act was not constitutionally adopted, the courts may act upon this evidence, and adjudge the statute void. But whenever it is acting in the apparent performance of legal functions, every reasonable presumption is to be made in favor of the action of a legislative body; it will not be presumed, in any case, from the mere silence of the journals, that either house has exceeded its authority, or disregarded a constitutional requirement in the passage of legislative acts, unless where the Constitution has expressly required the journals to show the action taken, as, for instance, where it requires the yeas and nays to be entered." Cooley on Con. Lim., pp. 135-6; see, also, Sedgwick on the Construction of Statutes and Constitutional Law; 2 ed. Pomeroy's Notes, p. 539, and notes.

This rule was followed in *Burr & Co.* v. *Ross & Leitch, supra,* when it affirmatively appeared from the Senate journal that the Senate indefinitely postponed a house bill, which went upon the statute book as a law, and the court held it not to be a law.

So the rule was recognized in *Vinsant, adm'r,* v. *Knox, supra;* in *English* v. *Oliver, supra.*

The rule was also approved, and the validity of the Revenue Act of April 28th, 1873, upheld on a looser House journal than the one now before us. The silence of the journal, helped by implication, saved the act. Mr. Justice Gregg had before him

about such a journal as the Supreme Court of Minnesota had before it, in *Board of Supervisors* v. *Heenan*, 2 Minn., 339; when Mr. Justice Flandsan said: "When journals are kept as loosely as these seem to be, the court will endeavor to sustain a law, if its constitutional passage can be spelled out of them."

Mr. Justice Walker was by no means favorably impressed with the reading of the legislative record in *State* v. *Little Rock, Mississippi River and Texas Railroad Company, supra,* but the bonds were held void because the act was not in force when the election was held, and the court gave no opinion as to whether it could be upheld as a valid act from the showing of the journals.

In this case the House Journal shows that the original bill was read the first time, and by unanimous consent, under a suspension of the rules, read a second time by title, ordered printed, and referred. The journal does not show that the second substitute, which was adopted in lieu of the original bill, was read a first and second time, but it does show that it "was read a third time" and passed, and that the vote upon its passage was taken by yeas and nays, after the reading of the bill was concluded, and entered on the journal. It may be that the House imputed the two readings of the original bill to the substitute adopted in lieu thereof, and in fact read the substitute but once; but we cannot positively affirm that such was the fact. The rules may have been suspended, and the substitute read three times before its passage, for anything that affirmatively appears to the contrary, and we are not at liberty to presume that the members of the House disregarded a constitutional obligation. The presumption, as we have seen, is the other way, when the journal is silent.

The Senate Journal shows that the bill, as passed by the House, and sent into the Senate, was read the first time, and under suspension of the rules, read the second time, and referred

to the committee on finance. That on a subsequent day, the chairman of the committee recommending that the first section of the bill be amended, by inserting after the word "Van Buren" the word " Crawford." The word " amendments," plural, is used in the report, and in the journal entries of both houses, but these are manifestly mere clerical misprisons, for it clearly appears that but one amendment was recommended by the committee, and but one adopted by the Senate.

It seems that the first section of the bill, as passed by the House, read thus :

Sec. 1. That the Board of Supervisors of the following counties of this State, to-wit: The counties of Jefferson, Chicot, Pulaski, Sebastian, Conway, Pike, Clark, Poinsett, Pope, Randolph, St. Francis, Woodruff, Crittenden, Sevier, Little River, Franklin, Hempstead, Phillips, Van Buren, ——— are hereby empowered to issue the bonds of such counties in any sum necessary to pay outstanding indebtedness of such counties, including unliquidated claims against the same, due at the time of the passage of this act.

The insertion of " Crawford" after " Van Buren," made the act embrace the County of Crawford, and so it is embraced in the enrollment, and in the published act.

Two days after the committee reported, the bill was called up in the Senate, the amendment recommended by the committee adopted, the bill as amended read the third time, and passed, the vote on its passage being taken by yeas and nays, and entered on the journal.

On the day that the bill was passed by the Senate, (April 23d,) it, with the amendment adopted by the Senate, was returned to the House, and the House concurred in the amendment.

It might seem, from a note of the journal clerk, in brackets, that the amendment adopted by the Senate was not present when

concurred in by the House, but from facts appearing on the journal, taken in connection with the entry proper of the concurrence of the House in the amendment of the Senate, we are not at liberty to so construe the notes of the journal clerk.

It appears that the two houses adjourned *sine die* on Friday, at 12 o'clock M., on the 25th of April, at which time the journal of the House had not been made up; and that under a resolution of the House it was afterwards completed, and the enrollment of bills finished, under the supervision of the Speaker, two of the committee on enrollments, etc.

It is probable that when the journal clerk came to make up the entry of the concurrence of the House in the amendment of the Senate to the bill in question, he found that the amendment had been taken from the files of the House for the use of the committee on enrolled bills, and not returned, and made a note of the fact as an excuse for not copying the amendment upon the journal.

Our conclusion is, that it does not appear from the journals that the act of 29th April, 1873, in question, was not passed in conformity with the Constitution of 1868, as to the reading of bills, etc.

It is further insisted that the seventh section of the act is void under sec. 22, art. v, of the Constitution, which provides that: "No act shall embrace more than one subject, which shall be embraced in its. title."

Sec. 7 of the act is as follows: "The bonds of any county that may have been heretofore issued for the purpose of funding any outstanding lawful indebtedness, that is to say, of any county herein named, are hereby declared to be valid and lawfully issued, as though issued under this act."

The Chancellor held that the matter of this section was germain to the subject, or purpose of the act, and embraced in its

title, and in this we concur under previous decisions, in which the clause of the Constitution in question was sufficiently discussed. See *Loftin* v. *Watson*, M. S., and cases cited.

It was, no doubt, a public misfortune that the act was ever passed, and it was repealed by Act of May 29th 1874. If fraudulent bonds were issued under it, as alleged, neither the bonds or the holders are before us in the suits. The constitutional passage of the act is the question presented to us, and we have decided it.

As to the Funding Act of March 6th, 1875. By the Constitution of 1874, the judicial power of the State is vested in a Supreme Court, Circuit Courts, County and Probate Courts, and Justices of the Peace, etc., and the jurisdiction of the several courts is defined, etc. Art. vii, sec. 1, etc.

The County Courts are invested with "exclusive original jurisdiction in all matters relating to county taxes, roads, bridges, ferries, paupers, bastardy, vagrants, the apprenticeship of minors, the disbursement of money for county purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective counties. The County Court shall be held by one Judge, except in cases otherwise herein provided." Ib., sec. 28.

"The justices of the peace in each county shall sit with and assist the County Judge in levying the county taxes, and in making apropriations for the expenses of the county, in the manner to be prescribed by law; and the County Judge, together with a majority of such justices, shall constitute a quorum for such purposes; and in the absence of the County Judge, a majority of the justices of the peace may constitute the court, who shall elect one of their number to preside. The General Assembly shall regulate by law the manner of compelling the attendance of such quorum." Ib., sec. 30.

This section authorizes the justices of the peace to sit with and assist the County Judge in levying county taxes, and in making appropriations for the expenses of the county; and it is the only provision of the Constitution making justices of the peace members of the County Court, or empowering them to sit with the County Judge. In other matters, that is, in the exercise of all other jurisdiction vested by the Constitution, the legislature can no more authorize justices of the peace to sit with him than it can empower other magistrates or private citizens to share in the jurisdiction confided to him by the Constitution. As well attempt to authorize other officers, or persons, to sit with a Judge and concur in, or overrule, as they might deem proper, his judgment in the exercise of judicial power entrusted to him by the Constitution.

The Act of March 6th, 1875, in substance, attempts to authorize the County Court, constituted of the Judge and a majority of the justices of the peace of the county, to issue the bonds of the county to pay the outstanding indebtedness of the county, including unliquidated claims due 30th of October, 1874, and to take up outstanding warrants, etc., and in auditing the claims, etc., and determining whether bonds shall be issued, etc., the County Judge is allowed but a vote, and of course may be overruled by the voices of the sitting justices of the peace, who are made his peers.

Sec. 6 provides for levying a special tax to pay the principal and interest on bonds under the act.

We hold, as the Chancellor did, that the act is in conflict with the Constitution and void.

It follows that the specific levy of two mills made by the County Court in 1875, to pay interest on bonds to be issued under this act was illegal.

Worthen, County Clerk, vs. Badgett et al.    Same vs. Faust et al.

We conclude this branch of the cases, by recapitulating that the levy of four and a half mills for 1873, to pay the interest on the funded debt, and the levy of a like rate for 1874, for the same purpose, were not illegal by reason of the invalidity of the funding act of April 29th, 1873; but that the specific tax of two mills levied for 1875, to pay interest on bonds to be issued sued under the funding act of 6th of March, 1875, was illegal,, because the act was unconstitutional.

SECOND—AS TO THE BUILDING TAX.

Both bills allege that the county tax for 1873, of thirty-five cents on the $100, (three and one-half mills on the dollar,) for the erection of buildings, and the fifth item in the levy of 1874, of two and a half mills on the dollar, for building purposes, were illegal.

The Badgett bill, as to these levies, alleges that prior to the levy of the county tax for 1873, the County Court entered into a contract with Wm. S. Oliver, then Sheriff and Collector of Pulaski County, by which he signed and bound himself to erect a jail building for the county, and the County Court bound itself to levy a tax from year to year to pay for the same. That the levy of three and a half mills for building purposes, made for the year 1873, was for the specific object of complying with said contract; but before the tax-book of that year was placed in the hand of Oliver, collector, to-wit: on the 1st of January, 1874,. he surrendered his contract to build the jail, and it was annulled.. That nevertheless, Roland, then County Clerk, allowed said building tax to remain upon the tax-book when it went into the hands of Oliver, etc. That not only was the said contract with Oliver annulled, but there was then, and had since been no other building, or appropriate purpose to which said tax, when collected, could be applied; and that whatever amounts had been collected of other tax-payers, under said levy, had long since.

been used for other than building purposes.   And the bill charges that said levy was allowed to remain upon the tax-book, notwithstanding the annulment of the contract with Oliver, in order to give color to a flagrant violation of law in exceeding the limit allowed for county governmental purposes.

The bill further charges that the levy of two and a half mills in 1874, for building purposes, was without authority of law, because that, at that time, and at no time since, was there any county building in contemplation, or contracted for.

That the total assessed value of the real and personal property of the county for that year was $14,000,000, more or less, and that said two and a half mills was equivalent to a charge upon the tax-payers of the county of $35,000, which, with the levy of three and a half mills for the preceding year, would create a fund of upwards of $84,000.

That the levy of two and a half mills, by the Board of Supervisors in the year 1874, for building purposes was a mere device to give color, and excuse the levy, and that the fund arising therefrom had been, and was intended to be, appropriated to other objects than that for which it was levied.

The answer of Worthen to the allegations of this bill, relating to the building levies, is quite brief and formal.

He denies "that there never has been any building or appropriate purpose to which the three and a half mills levy for building purposes made for the year 1873, could, when collected, have been applied, save and except the building contract with Oliver as set out by plaintiffs.   He denies said fund was, or had been used for other than building purposes, and denies it was done in order to give color to violation of law in exceeding the limit allowed for taxation for county general purposes.

"Denies that the levying of two and a half mills for the year 1874 was without authority of law.   Denies there was no county building in contemplation.

NOVEMBER TERM, 1877.　　525

Worthen, County Clerk, vs. Badgett et al.　　Same vs. Faust et al.

"Denies it was a mere device to give color and excuse the levy."

If the County Court, or Board of Supervisors, had made any contract other than with Oliver, for the erection of any county building, or had any building in contemplation for which a tax might be levied, when the building tax for the year 1874 was levied, the appellant did not think proper to disclose it, but was content to make mere formal denials of the allegations of the bill which relate to these levies, as far as they are denied at all.

The Faust bill makes, in substance, the following allegations in relation to the building levies in question :

That the tax levied for the year 1873 for the erection of buildings, of thirty-five cents on the hundred dollars (three and a half mills), and the tax of two and a half mills levied for 1874, were both wholly illegal and without authority of law. That these taxes were levied respectively as aforesaid on the 10th day of October, 1873, and on the 9th day of October, 1874, and that on neither day was there any law of the State which authorized said Board to levy any tax whatever for any such purpose.

Copies are exhibited of the only orders, as alleged, ever made by either the County Court or Board of Supervisors relating to buildings, etc., and it is alleged that no other orders relative to public buildings appear, or can be found on the records of the court or board.

By these exhibits (continues the bill) it is shown that on August 21st, 1871, the sheriff was ordered to post notices in each township notifying the justices of the peace of the county that a tax would be levied at the next term of the court to buy a lot, and build a jail. That on August 28th, 1871, one McCormick was appointed a commissioner, and ordered to procure and submit specifications for a jail at a cost not to exceed $50,000. That on December 6th, 1871, McCormick submitted plans and

specifications, which were, approved, and he was ordered to re-
ceive bids and report terms of a contract.    That on February
14th, 1873, McCormick was removed and David Reeve, who was
the County Judge, and presiding Judge of the court, was ap-
pointed commissioner to make contract, and the clerk was
ordered, on contractor giving bond for $50,000, to issue bonds of
the county for $50,000.

That on March 17th, 1873, Reeve reported that he had made
a contract with Oliver to build a jail for $135,000, payable
$50,000 in bonds at eighty cents on their face, and the residue
in instalments.    That on March 17th, 1874, on Oliver's petition,
the contract was rescinded, and his bond for performance can-
celled.

And plaintiffs, having averred the above facts, further allege
that there was no other county building contracted for or or-
dered or contemplated at the time, or either of the times, when
said taxes were levied.

The allegations of the bill were admitted to be true by the
demurrer.

It is useless to inquire in the cases now before us, whether
Oliver's contract to build a jail was valid under any statute in
force at the time it was entered into or not, because it is shown
by an exhibit to the Faust bill that on the 17th of March, 1874,
he surrendered to the Board of Supervisors all the county bonds
which had been issued to him under the contract, and, upon his
own request, the contract was annulled, and, he and his sureties
in the bond for its performance released.

Upon the rescision of Oliver's contract, the tax book of 1873
then being in his hands as collector, with a warrant authorizing
him to collect all of the taxes levied for that year, including the
specific tax of three and a half mills for the erection of public
buildings, which, according to the admitted allegations of the

Faust bill, was levied under that contract, and for no other purpose, the Board of Supervisors should have issued a mandate to him to stop the collection of that tax; and the board failing in this, any taxpayer, upon the showing made in these cases, might have obtained from the Chancery Court an injunction to restrain its collection.

The tax of two and a half mills levied for building purposes in October, 1874, for the like reasons, that no county building was under contract, none ordered and none contemplated, might have been enjoined.

To permit the Board of Supervisors to impose upon the taxpayers of the county, heavily burthened with other levies, over $80,000 in two years, as alleged in the Badgett bill and not denied, for building purposes, when no county building had been legally contracted for, none ordered and none contemplated, as alleged in the Faust bill, and admitted by the demurrer, must have been in the eyes of the Chancellor, if timely applications had been made for injunctions, simply monstrous.

In *Greedup* v. *Franklin County et al.*, 30 Ark., 106, a levy of three-fourths of one per cent. for the payment of county indebtedness was made upon the false assumption that Franklin County had an outstanding debt, when in fact the county had no such debt, and this court held that the collection of the tax should be enjoined.

These questions have not been argued by the Attorney General, who represents the appellant, and we deem it unnecessary to decide them in this case.

If the provisions of ch. 42, Gould's Digest, were in force at the times when these levies were made (see Gantt's Digest, title "Board of Supervisors," secs. 652 to 668, etc.), it appears from the allegations of the Faust bill, admitted to be true by the demurrer, that the Board of Supervisors disregarded them in making the levies.

Worthen, County Clerk, vs. Badgett et al.     Same vs. Faust et al.

These building levies for the years 1873 and 1874 were carried over and charged against the lands and lots of appellees upon the tax book of 1875, and were among the taxes for which they were sold to the State in May, 1876, by the collector, and we hold that the appellees are not obliged to pay them as a condition to obtaining an injunction against appellant, restraining him from making a certificate of conveyance to the State for the lands and lots of appellees so purchased by her.

### THIRD—MANDAMUS TAX.

It is insisted that the seventh item of the levy of 1874, of two and a half mills to pay a judgment recovered against Pulaski County, by Kinzey, in the United States Circuit Court, etc., was in excess of the levying power vested in the Board of Supervisors by the Statute then in force. The record entry making the levy, and above copied, is very awkward as before observed, and the *mandamus* directing the Board to make the levy is not before us. We take it that this levy of two and a half mills was in addition to the five mills levied for ordinary county purposes, and was not to be deducted therefrom—in other words, that they were distinct levies, one for five and the other for two and a half mills, and no doubt they were so extended on the tax book. The Board had authority to make the additional levy of two and a half mills to pay a debt of the county, which had gone into a judgment, under sec. 5060, of Gantt's Digest, which was in force when the levy was made.

### FOURTH.

Some other objections were made in the bills to the county levies, which were overruled by the Chancellor, and which have not been pressed in the argument here. The objection that a majority of the justices of the peace of the county were not

Worthen, County Clerk, vs. Badgett et al.      Same vs. Faust et al.

sitting with the County Judge when the levies and appropriations for 1875 were made, appears not to be true in point of fact.

We have not failed to observe that the County Court, in making the levies for 1875, directed the collector not to receive county warrants issued prior to the adoption of the present Constitution in payment of the levy of five mills for general county purposes, but no question has been made about this direction in these cases. On this subject see *Loftin, coll.,* v. *Watson, ante.*

## III.

### AS TO PENALTIES.

Having passed upon the objections made to the school levies and county levies for the years 1873, 1874, and 1875, we will next consider what penalties appellees should pay for failing to discharge such taxes as were legally assessed upon their lands and lots, for the years in question.

The appellees (except John W. Faust and wife) failed to pay the taxes charged upon their lands and city lots for the year 1873, within the time prescribed by law, and they were returned delinquent, and avertised for sale.

Before the sale day, the legislature, at the called session, in May, 1874, passed the Act of 16th May, to suspend the sale of delinquent lands, etc. (Acts of 1874, p. 1).

By sec. 1, of this Act, the sale of all delinquent lands, then upon the delinquent lists on file in the several clerk's offices of the State, for the non-payment of taxes due thereon for the years 1872 and 1873, was suspended until the time provided by law for the sale of delinquent lands for the taxes due for the year 1874.

By sec. 2, it was provided, that at any time before the 20th of April, 1875, the delinquent taxes might be paid; and all lands forfeited to the State for the taxes due thereon, and not sold by

34

the State, might be redeemed by the payment of the taxes assessed against them, with costs of sale, without penalty.

By sec. 4, it was made the duty of the several clerks, etc., in making up the tax books for the year 1874, to extend against the lands returned delinquent for the taxes of 1872 and 1873, and upon which the taxes and costs had not been paid, the amount of the delinquent taxes, and costs of returning and advertising such delinquent lands, if advertised—if not advertised, the cost of returning such delinquent lands—without penalty; and the collectors were required to proceed to collect the delinquent taxes and costs, in the same manner as provided by law for the collection of taxes due for the year 1874, but nothing in the act was to be construed to prevent collectors from receiving the taxes and costs on said delinquent lands, at any time after the tax books for 1874 came to their hands.

Had appellees paid their delinquent taxes for the year 1873, at any time before the 20th of April, 1875, the time limited for the payment of the taxes for 1874, no penalty could have been charged upon them, the penalty being condoned by this act.

The taxes charged against the lands, etc., of appellees for the year 1873, were carried over and extended against them on the tax book for 1874, as provided by the above act.

On the 22d of February, 1875, and before the expiration of the time limited for the payment of the taxes of 1873 and 1874, the legislature passed an act to relieve the tax payers of the State, and to suspend the enforcement of the collection of the taxes for the years 1873 and 1874. (See Acts of 1874-5, p. 160).

By sec. 1 of this act, (the preamble reciting that the people were in a bankrupt and impoverished condition, by reason of the enormous taxes unjustly imposed upon them for the previous five years, and in consequence of failure of crops, etc., unable to pay their taxes), it was provided that the sales of property, both

real and personal, for the non-payment of taxes for the years 1873 and 1874, should be suspended for the period of one year from the 31st of March, 1875, and the sheriffs and collectors of revenue were thereby restrained from making sales of property, either personal or real, for said period of one year, for the non-payment of taxes for the years 1873 and 1874.

By sec. 2 it was provided, that if any person failed to pay taxes for the years 1873 and 1874, within the time then prescribed by law, it should be the duty of the sheriffs and collectors of the several counties to make out a true and perfect list of such delinquent taxes, and file the same in the office of the county clerk of the respective counties, on or by the first of June, 1875.

By sec. 3, it was made the duty of the clerks of the several counties, in making out the tax books for the year 1875, to include such delinquent list for the years 1873 and 1874, together with a penalty of 15 per centum on such delinquent taxes, which should be collected as other taxes, and paid in the treasury as required by law.

Had appellees paid the taxes legally charged upon their lands for the years 1873 and 1874, by the 20th of April, 1875, no penalty could have been imposed upon them for either year. But as they thought proper to avail themselves of the grace offered by the Act of 22d February, 1875, they accepted it on the condition upon which it was offered; that is, they should pay a penalty of 15 per cent. upon their delinquent taxes for two years. This was a compensation to the public for being deprived of the use of the money during the period of grace allowed the tax payers. There, must, however, be no compounding of penalties. A single penalty of 15 per cent. upon the legal taxes for the two years is all that can be exacted.

Upon the legal taxes for the year 1875, appellees are subject to a penalty for delinquency of 25 per cent., under sec. 21 of the Act of March 5th, 1875.    Acts of 1874-5, p. 228.

There can be no penalty for the non-payment of an illegal tax.

## IV.

### IRREGULARITY IN THE TAX SALE.

The Faust bill alleges, and it is admitted by the demurrer, that each tract, or town lot, was not offered for sale for the aggregate amount of taxes, etc., charged upon it for three delinquent years; but that each tract or lot was actually offered, and knocked off three times: *First*, for the taxes charged for 1873; *second*, for the taxes and penalty charged for 1874; and *third*, for the taxes and penalty for 1875, and that they were so entered upon the clerk's book.

By the 15th section of the Act of March 5, 1875, (Acts of 1874-5, p. 226), the legislature abandoned the mode of selling lands for taxes to the highest bidder, and giving the land owner the surplus of the proceeds of sale, if any, which was adopted after the war; and returned to the former and juster mode of selling to the bidder who offers to pay the taxes, etc., for the smallest sub-division, etc., and if no bidder can be obtained for a less quantity, to offer the whole tract or lot; and if no one will offer to pay the amount of taxes, penalty, and costs, for the tract or lot, etc., the collector is required to bid the same off in the name of the State, bidding therefor the amount of taxes, penalty and costs, etc.

It so happened in this case, that the collector could get no other bidder, and the State became the purchaser of the lands and lots of appellees, by having them struck off to her three several times. But may others not have been deterred from bidding by this manner of sale?

## NOVEMBER TERM, 1877.    533

Worthen, County Clerk, vs. Badgett et al.    Same vs. Faust et al.

Suppose, for example, that A had bid off a tract for the taxes of 1873, and the collector had put it up again for the taxes, etc., of 1874, and B had purchased it, and on the next offer for the taxes, etc., of 1875, C had bought it, who would be entitled to the land? It would be like the woman of the Scriptures who had seven husbands, and the question was, which of the seven would have her in the resurrection?

The Chancellor had a poor opinion of this manner of conducting a tax sale, and so have we.

There should have been but one offering and sale of each tract or lot, for all of the taxes, etc., charged upon it.

## V.

### HE WHO SEEKS EQUITY MUST DO (OR OFFER TO DO) EQUITY.

The city, district school, county and State taxes, charged upon the lands and lots of appellees for the years 1873, 1874, and 1875, were upon the tax book of 1876, and all embraced in the warrant of the collector of that year, and the State, at the collector's sale, commencing on the third Monday of May, 1876, by reason of the failure of appellees to pay their taxes, purchased their lands and lots for the taxes, penalties and costs charged upon them. They were allowed by law two years to redeem their lands and lots, just as they would have been if they had been purchased by individuals.

Where lands are purchased by an individual at a tax sale, and the owner fails to redeem within the time prescribed by law, the County Clerk makes him a deed.

Where the State is the purchaser, and the lands are not redeemed, the clerk is required to make a certificate of sale to the State, and cause the same to be recorded, and thereupon the title to all lands embraced in the certificate vests in the State, and the clerk transmits the certificate, after it is recorded, to the Com-

missioner of State Lands, and thereupon the lands are subject to be disposed of as other forfeited lands. Acts of 1874-5, p. 226. 227-8, etc.; Miller's Digest, secs. 138 to 165.

The bills in these cases were brought within the period of redemption, to enjoin the clerk from making the certificate of conveyance to the State. After the conveyance is executed, appellees have no remedy against the State; they cannot bring suits against her to set aside the conveyance; hence they made applications to the Chancellor, and asked him to stay the hand of the clerk and prevent him making the conveyance to the State.

That the tax sale was illegal, there can be no doubt under repeated decisions of this court, because, as we have shown, there were illegal taxes in the warrant of the collector, under which the sale was made.

But does it follow that appellees could rightfully demand and obtain relief from the Chancellor without terms?

They made no complaint of the State taxes, or the city taxes, charged against their lands or lots for either of the delinquent years, nor of some of the separate and distinct items in the several county levies, nor of the district school taxes for the year 1875.

The plaintiffs in the Badgett bill did not allege that they had offered to pay the clerk any delinquent tax to redeem their lands, nor did they express to the Chancellor a willingness to do so; yet they prayed, and obtained an injunction against the clerk perpetually restraining him from making the conveyance to the State, without terms, and the State was left to collect the taxes justly charged upon their lands as best she could.

The plaintiffs in the Faust bill recognized the well settled rule that he who seeks equity must do, or offer to do, equity. They alleged that they had at all times been, and were willing to pay all taxes legally charged or chargeable upon their lands and

town lots, and would pay such legal taxes, but the defendant clerk would not accept the same, and refused to allow any redemption except upon payment of all taxes and penalties charged against them, and also all the costs of advertising and selling the lands, etc.

It was, of course, within the power of the Chancellor to control the conduct of the clerk, and compel him to accept in redemption such taxes, etc., as the plaintiffs were equitably obliged to pay; but the Chancellor was of the opinion that they were obliged to pay nothing as a condition of obtaining the relief which they sought, and in the plenitude of mercy, but upon a mistaken view of the law, as we, with great deference to his learning, think, granted them a perpetual injunction against the clerk without terms.

At any time before the tax sale, the Circuit Court would have quashed, on *certiorari*, any one, or more, distinct items in the levies for the several years, which appeared upon the face of the record of the County Court, or Board of Supervisors, to be illegal. *Vance* v. *The City of Little Rock*, 30 Ark., 436; *Murphy et al.* v. *Harbison*, 29 Ark., 340. But the court would not have quashed all of the items in the levies because some of them were illegal, and thereby relieved the applicants from paying any of the taxes.

So at any time before the tax sale, on a proper bill by taxpayers, the Court of Chancery would have enjoined the collection of any one or more of such illegal items (Gantt's Dig., p. 650, sec. 3451); but the court would not have enjoined the valid items distinguishable from the bad, but would have left them to be enforced against the tax-payers. *Greedup et al.* v. *Franklin County et al.*, 30 Ark., 103.

Nor will a Court of Chancery enjoin the execution of the tax deed, after the sale, or set the deed aside after it is made, without

requiring the land-owner to pay the tax purchaser the legal taxes, penalties, etc., which he has paid for the defaulting land-owner in the purchase of the land, and the legal taxes paid upon the land by the purchaser subsequent to the sale, etc.     *Twombly* v. *Kimbrough*, 24 Ark., 475; *Haney* v. *Cole et al.*, 28 Ark., 299; Sec. 178, Act March 25th, 1871; Gantt's Dig., sec. 5214, 2267-8-9.

. In *Mayor and Aldermen of Mobile* v. *Waring*, 21 Ala., 150, where the tax-payer sought to enjoin the collection of an excessive tax, but offered to pay nothing, the court applied the familiar rule, that he who seeks equity must do equity.

So in *Parmley* v. *Railroad Companies*, 3 Dillon C. C., 34; Justice Miller said: "We are all united on another proposition, and that is, whenever a party comes into this court to ask the court to enjoin the collection of a tax or part of a tax, if there is any part he admits to be due, or which the court can see upon the statement in the bill ought to be paid, there must be an allegation in the bill conforming to the fact, that they have paid, or that they have tendered it, and it is not a sufficient allegation that they are willing to pay, or that they pay into court, because the State is not to be stayed in its revenue, which is admitted to be due in that way; and a party claiming that he will not pay his tax, or any portion of it, cannot screen himself during a course of long litigation from paying that which must be paid, and everybody can see must be paid, by setting up a contest over that which is doubtful, and which may or may not eventually, be necessary to be paid."

Mr. Cooley, says: "The court also have sometimes imposed conditions to equitable remedies where they deemed the public interest to demand it. Thus where an injunction has been applied for to restrain the collection of a tax, partly legal and partly not, the court has made the payment of the legal, a condition

precedent." Cooly on Taxation, p. 537, and cases cited in note.

In the State Rail Road Tax cases, 2 Otto, 617, the Supreme Court of the United States held, with unanimity, that no injunction, preliminary or final, could be granted to stay collection of taxes, until it was known that all taxes conceded to be due, or which the court could see ought to be paid, or which could be paid or tendered without demanding a receipt in full, were paid, or offered to be paid.

So in *Roseberry, Treasurer, etc.,* v. *Huff,* 27 Ind., 12, it was held that a person asking the aid of a Court of Chancery to restrain the collection of taxes, a part of which only are alleged to be illegal, must first pay, or offer to pay, the taxes legally due from him, on the principle that a party asking the aid of a Court of Chancery, must do equity.

So the rule was applied in *Hersey* v. *Supervisors of Milwaukee,* 16 Wisconsin, 186, when the bill was filed to enjoin the execution of the deed, and cancel, the certificate of purchase, some of the taxes for which the lots were sold being legal and others illegal, the court holding that the defaulting tax-payer must pay the legal taxes before he could obtain relief against such as were illegal.

See also, *Miles* v. *Johnson, Clerk, etc.,* 28 Wisconsin, 598, which was likewise a bill to enjoin the execution of tax deeds by the clerk of the Board of Supervisors, and cancel certificates of sale, and the court held, that if the legal taxes could be separated from the illegal taxes, equity would require the payment of the former, as a condition of relief against the latter.

So *Bond* v. *The City of Kenosha et al.,* 17 Wisconsin, 286, was a bill to restrain the execution of a tax deed, on the grounds that some of the taxes for which the lands were sold were illegal, and the court said : "We have held that when the valid and void taxes were separable, and the amount of the former could be

readily ascertained, then the resisting tax-payer must pay those which were legal as a condition to being relieved from the payment of the illegal tax."

It is insisted by counsel for appellees that while such may be the rule where an individual is the purchaser, it ought not to apply where the State is the purchaser. And why not? Is not the defaulting tax-payer under as great an obligation to render to the State, which protects him in his life, liberty and property, money legally due to her, as he is to reimburse the citizen who purchases his land at an illegal tax sale, but thereby pays to the State such taxes as were justly due from him. The Court of Chancery will not compel him in the one case or the other, to pay more than what was rightly charged upon his land, with such penalties and costs as the law imposes for his actual delinquencies. See sec. 5214, Gantt's Digest; Acts of 1874-5, p. 226-7.

In the Badgett case the bill being bad, because the plaintiffs offered to pay nothing, the decree should have been against them on the demurrer to the answer.

In the Faust case, the court erred in decreeing a perpetual injunction, without requiring the plaintiffs to pay any thing.

The decrees must be reversed, and the causes remanded with instructions to the Chancellor to grant the injunctions prayed for, upon the parties paying under his directions, such taxes, penalties and costs, as are legally charged and due upon their lands, and to dismiss the bills as to any who decline to accept relief on such terms.

We were told in the oral argument of the causes, that if some of the parties could not obtain injunctions except upon the condition of paying the taxes, etc., legally charged upon their lands and lots, they would permit them to be conveyed to the State, and when the State sold them, again apply to the courts to set

aside the deeds. They are, of course, at liberty to adopt this plan if they think proper, but they may find in the end, that taxes, like the covenants of a deed, are the serfs of the soil and follow it. We sympathize with the overburdened tax-payers, but we doubt if the indulgence granted them by legislation, has not proved a delusion. It is not our province, however, to make or unmake tax laws, but to construe and administer such as we find on the statute books.