THE BOARD OF SUPERVISORS OF RAMSEY COUNTY *vs.* EDWARD HEENAN.

Sections thirteen, twenty and twenty-seven of Article IV. Constitution of State of Minnesota, providing the manner in which the Legislature may pass laws, is not merely directory, but the provisions of those sections must be strictly followed.

Questions concerning the constitutionality of a law must be tried by the Court, and not by a jury : and for this purpose, the Court may inspect the original bills on file with the Secretary of State, and have recourse to the journals and debates of the houses of the Legislature, to determine whether or not the law has received all the constitutional sanctions to its validity; and the Courts will sustain the law, if these provisions have been substantially carried out, and not regard mere clerical errors.

The Act of August 13, 1858, providing for a Township organization (Laws of 1858, page 206) was passed in accordance with the provisions of the Constitution, and does not embrace more than one subject-matter, within the spirit and meaning of the Constitution.

This was an application by the Board of Supervisors of Ramsey County, against Edward Heenan, Register of Deeds

of said county, for a peremptory writ of Mandamus, requiring him to deliver up certain books and papers in his office relating to sales of lands for taxes; to the custody of which books and papers the Petitioners claimed to be entitled, by virtue of their organization under the "Township Act" of August 13, 1858.

The questions arising upon the argument are presented in the Opinion of the Court.

I. V. D. HEARD and M. E. AMES, Counsel for Petitioners.

SMITH & GILMAN, Counsel for Respondent.

*By the Court*—FLANDRAU, J. The Defendant is the Register of Deeds of Ramsey County, and this is an application for a peremptory writ of Mandamus to compel him to deliver to the Board of Supervisors certain books and papers relating to the taxes of the County. The application is made under Section 9 of the Act of August 13, 1858, page 206 Laws 1858. Against the issuing of the writ, it is urged that the Act of August 13, 1858, is unconstitutional, in not having been read on three different days in each house of the Legislature, and twice at length; in not having been voted for by a majority of all the members elected to each house, and in embracing more than one subject-matter not expressed in its title. (Sections 13, 20 and 27 of Art. IV. *State Constitution.*) The question is for the first time presented for judicial determination as to the force and effect of Section 13 and Section 20 of Article IV. of the Constitution. Section thirteen provides that "No law shall be " passed unless voted for by a majority of all the members " elected to each branch of the Legislature, and the vote en- " tered upon the journal of each house." Section twenty pro- vides that " Every bill shall be read on three different days in " each separate house, unless, in case of urgency, two-thirds of " the house where each bill is depending shall deem it expe- " dient to dispense with this rule; and no bill shall be passed " by either house until it shall have been read twice at length."

The subject is one of great importance in its effect upon the State, and I approach it with the sole aim of faithfully ascer- taining the intention of the framers of the instrument: the consequences of their action is with them, and not with the

Courts. There are many provisions in constitutions and statutes which, though explicit in terms, are construed to be only directory: but this results from the nature of the particular provision being confined to the regulation of the time or manner in which an act is to be performed, and where it is apparent that it was not designed to be operative as a condition, limitation or restriction upon the performance of the act enjoined or permitted; and must be generally governed by the nature of the subject treated of, more than by the language of the law. Clauses which are directory merely, must, in the nature of things, be much more frequent in statutes than in constitutions; because, to the former is committed the *modus operandi*, in minute detail, of the whole working system of the government, while the latter is confined to the more general establishment of the fundamental principles upon which, and the conditions and limitations under which, the system is to operate. Statutes command acts to be done, impose duties and obligations, and point out the road to their performance: to insure certainty and regularity throughout the country, the time when, the place where, and the manner in which the command is to be obeyed are generally particularized; but as the execution of the mandate is the principal object and aim of the law, a departure from the mode provided is often, where the public good demands it, and private rights are not interfered with in consequence of it, held not to invalidate the act, or, in other words, the provisions are declared to be directory only

There is a very material difference between provisions of apparently similar import in statutes and constitutions, and their meaning must be determined by the application of different rules and reasons. A constitution, and especially the legislative branch of our Constitution, is not a creative instrument. Beyond the establishment of the legislature, it is but a system of limitations and restrictions upon the power of that body. It commands the performance of no act by the legislature, but declares that if they do act that action shall be in a certain manner, and within prescribed boundaries.

The general power to legislate upon all subjects within the proper province of such a body is presumed by the Constitution and it is only such matters as are designed to be with-

drawn from their jurisdiction that the constitution taks espe-
cial care of. It will be conceded at once, that should a law
violate any of the restrictions in the Constitution pertaining to
the subject matter, or by restraining the liberty of the press—
denying the right of trial by jury, introducing slavery, or oth-
erwise, it would be void: this result would however be solely
because the legislature had exceeded its jurisdiction: if there-
fore there is no instance in which the legislature can transcend
the constitutional boundaries in regard to the subject matter
of a law, it can only be permitted to do so in relation to the
*prescribed mode* of its enactment, on the supposition that the
same reason did not exist for limiting its action in this respect
as obtained in the other.

I will examine whether the framers of the Constitution in-
tended the provisions of *Sections* 13, 20 & 27, *of Art.* 4, or any
of them above cited to be merely directory upon the legisla-
ture. This investigation will lead me to a review of the legis-
lation as practised previously in this Territory. Such changes
as are instituted by the Constitution, and departures from es-
tablished practices, when we were acting without any Consti-
tution, but that of the United States and the Organic Act,
must be considered as providing for some deficiency or intend-
ed to check some abuse which existed previously in the legis-
lative department. The Courts may have recourse to legisla-
lative proceedings, rules, journals and statutes, also to contem-
poraneous debates and undisputed history, to enlighten them-
selves on these points. Previous to the Constitution a majori-
ty of either House of the Legislature was a quorum to transact
business; and laws could be passed by a single member voting
in the affirmative, if no one voted against him; however objec-
tionable this may have been it was less liable to abuse in bodies
composed of a small number of members than in more numer-
ous assemblies. Each House made its own rules and could
alter them at pleasure by such vote as they should by rule
provide. The power of determining the rules of proceeding in
the separate Houses is continued by *Sec.* 4, *Art.* 4, but with ex-
ceptions which are specially enumerated, among which is that
" no law shall be passed unless voted for by a majority of all

the members elected to each branch of the legislature and the vote entered upon the journal of each House." *Sec.* 13, *Art.* 4. This is particularly directed at the practice under the former system which would have been more liable to abuse by the contemplated increase of the number of the legislators, and its observance is essential to the validity of a law.   If an act fails to receive the requisite number of affirmative votes to be evi- denced by the journal, it is as fatally defective as if it had fail- ed to receive the sanction of the executive.   The effect of the provision is to count every member of the body that does not vote affirmatively as voting against the passage of the act.

The next exception to the general power to pass rules is by *Sec.* 20, *of Art.* 4.  "Every Bill shall be read on three differ- ent days in each separate House, unless in case of urgency two thirds of the House where such Bill is depending shall deem it expedient to dispense with such rule.   And no Bill shall be passed by either House until it shall have been previously read twice at length."

The requirement to read in each House on three different days is not imperative but is qualified by the permission grant- ed to change the rule by a *two-third vote* in cases of urgency. The Houses are left free to change their rules by such vote as they may adopt on other matters, but in this respect a two- third vote is required : it is clear therefore, that the makers of the Constitution attached great importance to the provision, and greater force is given to this view from the latter clause of the section, which permits no bill to pass unless read twice at length, and no power is given to the legislature to change this rule under any circumstances ; we would be led to the conclu- sion by these provisions standing alone, that although a *case of urgency* might allow a departure from the former, by a two third vote, yet no circumstances could justify a failure to read the bill twice at length, and that to give effect to a law it must be done.   *Sec.* 21 *and* 11, *of Art.* 4, place it beyond doubt that a compliance with these rules is essential to the passage of a law, and not merely directory.  *Sec.* 21 declares that every bill shall be signed by the presiding officer of each House, and pro- vides a punishment for refusing so to sign.   And then to pre- vent the failure of the law in consequence of an officer not

signing, which would have been the effect of the provision standing alone, it provides that "in case of such refusal, each House shall by rule provide the manner in which such bill shall be properly certified for presentation to the Governor." Sec. 21, in harmony with the other provisions declares that "every bill which shall have passed the Senate and House of Representatives in conformity to the rules of each House, and the joint rules of the two Houses, shall before it becomes a law be presented to the Governor," &c. It would seem by this recognition, that the rules of the Houses were designed to be placed upon the same footing with the rules incorporated in the Constitution, but we will not decide any thing but what is strictly within the case at bar.

From the Constitution alone, I think sufficient can be gathered to show that these provisions were intended to be absolute, and that the validity of legislation should depend upon a compliance with them, as much as upon that of any other limitation or restriction contained in the instrument.

Experience has proved the necessity, from the loose and dangerous manner in which legislation had been conducted, of imposing some checks upon it, and although I may be of opinion that the Constitution has erred on the other extreme, still being satisfied that such was the intention of the framers of the instrument, I have but to expound and not change or question that intention.

The debates of the Convention presided over by Governor Sibley, show an energetic effort on the part of several members to defeat the passage of several of the provisions which we have been discussing, for the reason that the effect of them would be to make the validity of laws depend upon their fulfilment, which resulted in the Convention rejecting all amendments and adopting them substantially as reported from the committee, except in the case of *Sec.* 21, *of Art.* 4, where the qualifying clause at the end of the Section was adopted, or the presiding officer of each house would in effect have possessed a veto power superior to that of the executive, as there would have been no possible relief except in expulsion, and that would have been in most cases ineffectual to prevent the mischief. No member in the debate took the ground that the

effect of these provisions would be only directory, but all regarded them as intended to impose an unqualified obligation upon the legislature. *Debates, page* 231 *to* 271.

In the convention presided over by Mr. Balcombe, the report from the legislative committee contained only the provision that a majority should vote for each bill in order to pass it. *Sec.* 22 *of Report, page* 86 *of debates*. In the debate this provision was considered as imperative, and was stricken out for that reason. *Debates, pages* 201 *& * 202. One member only taking a different view.

There can be no doubt that the convention meant these provisions to be more than directory, and we must so decide.

A knowledge of the character of the legislation which preceded the forming of a State Constitution, will show that a very vicious system prevailed of inserting matter in acts which was entirely foreign to that expressed in the title, and by this means securing the passage of laws which would never have received the sanction of the legislature had the members known the contents of the act; it was to prevent frauds of this nature that Section 27 of Article 4 was passed, and it has and was intended to have the effect of defeating the action of the legislature, even if the members are so inattentive as to overlook such extraneous matter after the bill has been *read twice at length under Sec.* 20. The system is thorough and means to secure to the people fair and intelligible legislation, free from all the tricks and *finesse* which has heretofore disgraced it.

A similar provision is in the Constitution of California, New Jersey, New York, Ohio, and perhaps other States; in some it has been held to be directory, in others essential. If it is only directory, it is senseless, but if it held to mean what it imports, it is an advance in the science of government worthy of imitation by all States and countries whose legislatures are not absolute.

When questions of this kind are presented, they must be tried by the Court, and never as a fact by a jury. The Court may inspect the original bills on file with the Secretary of State, and have recourse to the journals of the Houses of the Legislature to ascertain whether or not the law has received

all the constitutional sanctions to its validity. *Thomas vs. Dakin*, 22 *Wend.* 9; *Warner vs. Beers*, 23 *Wend.* 103; *People vs. Purdy*, 2 *Hill* 31; 4 *Hill* 384; *De Bow vs. the People*, 1 *Denio* 9; *Commercial Bank of Buffalo vs. Sparrow*, 2 *Denio*, 97.

The act of August 13, 1858, was originally introduced into the House of Representatives on the 19th day of July, 1858, from the committee on township organization, and was read by its title. *House Journal*, *p.* 861-2, on the 22d day of July, it was read a second time, and considered in committee of the whole under the designation of *House File No.* 405, *pages* 901 & 902. July 23d it was reported from the committee of the whole to the House without amendments, and referred to a committee of three, *p.* 907.

On July 28th the committee report it back and think that the old bill which has been repealed, is with a few amendments the better one, and offer a bill of amendments to the old act as a substitute for *H. F. No.* 405, *p.* 932. After this for some time we lose sight of *No.* 405, but the Township Ooganization Act, is found under the style of *No.* 429. July 30, *No.* 429 is read a second time, *p.* 966.

On the 2d of August, the committee of the whole considered House File 429, and reported it back with amendments, under the title of "an Act to amend an Act to provide for Township Organizations," and recommend that it be engrossed for a third reading, which was adopted, *p.* 993-4.

On the 3d of August, the old file No. 405 was substituted for No. 429, which was stricken out after the enacting clause, *p.* 1001, and on the same day No. 405 was indefinitely postponed, *p.* 1002.

On the 4th of August the bill *No.* 405 seems to have been resuscitated and referred back to the committee who reported it, who on page 1042 report it back with various amendments, and recommend its passage.

On August 7th it was again considered in committee of the whole, and again referred to the committee, who reported it, with amendments, *p.* 1050.

On the 9th of August the committee reported back *No.* 405, printed, and recommended that the rules be suspended and

that it be put upon its final passage without engrossing, which was adopted by a vote 43 to 10, entered on the journal, *p.* 1060.

On the 10th of August, *House File No.* 429, was passed by a vote of 55 to 9, and its title agreed to, *p.* 1069.

From the entries which follow in the journals of the House and Senate, I am led to believe that on the last substitution of No. 405 for 429 on *p.* 1001 of the House journal, the bill which was before the House was called sometimes by one number and sometimes by the other; as the bill was very lengthy, it is more than probable that the same copy was used as far as possible for both the original and the substitute, and the confusion which ensued was occasioned by this fact.

After No. 429 passed the House on the 10th August, *p.* 1069, the journals of the Senate show that it was on the same day reported to the Senate as *No.* 429, which is the only message that was sent to the Senate from the House on the subject of either of these bills. *Senate Journal, p.* 702. Yet notwithstanding that *No.* 405 has not gone into the Senate, we find a Senator, on the 11th of August, the day after the bill No. 429 was sent in, and the last working day of the session, move that the rules be suspended and *H. F. No.* 405 be read a first and second time, which was done, and again it was on the same day read a third time and passed with amendments. It is described as *H. F. No.* 405, "a Bill for an Act to provide for Township Organizations."

The vote on the passage of the bill was 23 to 5. The bill, it is evident, carried on its face the two numbers and produced the same confusion of description in the Senate, that it did in the House, but was one and the same bill, changed to meet the different substitutions and mutations that it underwent, to save the trouble of re-writing it. This view is strengthened by the fact that immediately after passing *No.* 405 in the Senate, the Secretary reports to the House that "the Senate have passed House File No. 429, a Bill for an Act to provide for Township Organization with amendments, and herewith return the same."—*H. Journal, p.* 1087. And the House on the same day concur with the Senate amendments to Bill 429.—*H.*

*Journal, p.* 1088.    And No. 429 was approved by the Governor on the 13th of August.

If my solution of the difficulty presented by the journal entries is the correct one, then the bill which was passed in the House was read a sufficient number of times and passed that body by a constitutional majority, and in the Senate it was read three times on the same day under a suspension of the rules, and received a sufficient number of votes to pass it.

Where journals are kept as loosely as these seem to be, the Court will endeavor to sustain a law, if its constitutional passage can be *spelled out of them*, but in this case the difficulty seems susceptible of explanation quite satisfactorily.

We next come to consider whether the Act of *August* 13 is obnoxious to the objection of embracing more than one subject matter.    Previous to its passage, the first or primary political division of the State was into counties, no lesser organization being known, and the county was administered by three commissioners; the object of the act as its title indicates, is to change this condition of things, and subdivide the counties into townships, each of which is to be a separate government within itself, while a segment of each of the lesser governments are to aggregate and form the county governments.    The system of township organization has become so well understood in the United States, to embrace also the elements which compose the county governments, that the expression in its popular signification would generally embrace both, although the two organizations, notwithstanding that they are composed of the same materials, are as essentially different as the State and Federal governments.    It is true that this act in the technical sense, does embrace more than one subject, and but one is expressed in its title, yet so intimately blended are they in the popular understanding, and so inseparable by general custom and adoption, that although the technical sense may bring it within the letter of the Constitution, it leaves it entirely without the spirit.    There is no attempt at fraud, on the interpolation of matter foreign to the subject expressed in the title, but an honest effort to create a system of town, and through the town, county government, similar to that of other States. What is not within the spirit of a law, is not within the law,

although within the letter of it. *The People vs. the Utica Insurance Co.*, 15 *Johns.* 358. I think the law in question is not obnoxious to the objection in this respect urged against it.

I will now consider the duty of the Register of Deeds concerning the books and papers in his office relating to taxes or tax sales in his county.

Previous to the passage of the Act of August 13, 1858, for Township organization, the Register of Deeds was *ex-officio* Clerk of the Board of County Commissioners (*R. S.* p. 63, sec. 7), and performed all the duties which now devolve upon the County Auditor, who is Clerk of the Board of County Supervisors, which has superseded the old Board of Commissioners. The Register, as such clerk, prepared and delivered to the Sheriff the tax-rolls and the warrant for their collection. (*R. S.* p. 63, sec. 10.) The taxes were then collected by the Sheriff, and if any remained unpaid the delinquent list was returned by the Sheriff to the Register of Deeds. (*R. S.* p. 102, secs. 42–43; sec. 42 as amended on page 32 of the Amendments.) The lands upon which the delinquent taxes were assessed were then sold by the Register of Deeds (*R. S.* pp. 104–6): and this, we think, was a duty done by him in his capacity as Register, and not as Clerk, of the Board of Commissioners; because at this point the proceedings begin to effect the title to real estate, and it was designed that all records and proceedings connected with or effecting titles should be concentrated as far as possible in one office, which view is continued even after the passage of the Township Act, and properly so, as the history of the title to all lands is much clearer, safer and easier of access and comprehension when confined to one office than when distributed among several. After sale of the lands for unpaid taxes, the process of redemption was all through the Register of Deeds in that capacity. (*R. S.* pp. 107–9.)

Since the passage of the Township Act, very material changes have been made in the manner of collecting taxes and tax sales, but none in relation to the redemption of lands after sale. The taxes are collected by Town Collectors (*Township Act*, Art. XX. Gen'l Laws 1858, p. 212), and the delinquent tax list is returned by the Collector to the County Treasurer (*Art. XX.*

Sec. 6.) The lands are sold by the Treasurer, but the papers connected with the sale are, within twenty days after the sale, handed over by the Treasurer to the Clerk of the Board of Supervisors (*Art. XVI.* Sec. 5); which is in effect depositing them with the Register of Deeds of the county, because all the books and papers of the Board of Supervisors are kept on deposit with the Register of Deeds (*Art. XV.* Sec. 10.) This is necessary, in order to furnish the Register with the means of securing the redemption money and discharging the land sold for taxes, and otherwise performing his duties as the officer through whom the redemption is to be made.

The office of the Register of Deeds is, then, the proper permanent repository of all the "books, records and accounts of the Board of Supervisors," among which are included all papers connected with the taxes of the county, and the Register of Deeds is the custodian of them (*Art. XV.* Sec. 10); yet this custody is qualified by the right of the Board of Supervisors to demand and receive them from the Register when they may need them in the performance of their duties (*Proviso to Sec. 9 of Art. XV. Township Law*), and when such demand is made it is the duty of the Register to deliver them over.

Whatever difficulties and inconveniences may arise from the double right to the possession of the books for the performance of the duties of the different departments of the County Government, the Court has nothing to do with; but there is no necessity for any collision of rights and interests concerning the documents, where the officers are desirous of doing their duty and attending to the interests of the county as superior to their own.

A proper demand has been made by the Board of Supervisors for the books and papers, and as the Register has not delivered them, the writ of Mandamus should issue.