## Ex Parte W. V. Wren.

LEGISLATIVE ACT. *Evidence thereof. Whether journals competent.*

    An enrolled act of the legislature, having been signed by the speaker of the house of representatives, the president of the senate, and the governor, is the sole expositor of its contents, and is conclusive evidence that the act so signed contains the provisions of the bill as passed by the two houses. And the journals of those houses cannot be resorted to to show that such act does not contain amendments to the bill which were adopted by the two branches of the legislature. *Brady* v. *West,* 50 Miss. 68, overruled.

APPEAL from the decision of HON. T. J. WHARTON, Judge of the Ninth Judicial District, on *habeas corpus.*

W. V. Wren, a traveling salesman for Philip Laal, a dealer in groceries in the city of New Orleans, was exhibiting goods and soliciting and obtaining orders for like goods on behalf of Laal, in the city of Jackson, without having first obtained a license, in accordance with an act of the legislature approved March 18, 1886, entitled "An act to amend §§ 557 and 585, Code of 1880, so as to increase the public revenue, and provide for the faithful collection of the same." The sheriff of Hinds County demanded of Wren the payment of a State tax of twenty-five dollars, under the clause of the above-mentioned act, which places a privilege tax of twenty-five dollars "on each person traveling and selling goods or merchandise by sample or otherwise in this State," and as appears by the record, also demanded payment of a like tax for Hinds County under § 587, Code of 1880, and upon his refusal to pay the same,

placed him under arrest. Thereupon Wren obtained this writ of *habeas corpus*. It was alleged in the petition for the writ, and admitted in the return of the sheriff, that the act under which such arrest was made originated in the house of representatives, and that the parts applicable to this case are lines 408, 409, and 410 of the act above set out; that the senate, as shown by its journals, amended the act as follows, to wit: Add to line 410 of the bill the words, " and the privilege tax shall be paid but once, and shall entitle the party paying it to do business in all the counties in the State, and no municipal or county tax shall be imposed thereon;" that this amendment was numbered " 34" on the journal; that the senate also amended the said act by the insertion of the words, " and all laws now in force and not changed by this act, relating to the levy, collection, and payment of privilege taxes, and particularly §§ 586, 587, 589, 590, 591, 592, 593, 594, 595, and 596 [Code 1880] (each as amended), shall remain in full force and effect;" that the house of representatives concurred in these amendments; that the act approved by the governor wholly omits the amendment numbered " 34," and also omits the words " each as amended" in the other amendment above set out. The court on the hearing of the petition remanded the relator to the custody of the sheriff. Thereupon he appealed to this court.

*Calhoon & Green*, for the appellant.

If the court can only look at the face of the bill as enrolled, then the limitations in the constitution are void and of no effect, and the powers pretended to be thereby conferred upon the judiciary are of no avail, for the legislature promulges the act, and there exists no power to question it. It makes the legislature the *judge* whether the provisions of the constitution have been infringed. It violates the provisions of that instrument by allowing the legislative branch to exercise judicial functions.

To hear the English courts declare such a doctrine is as might be expected. There parliament is sovereign; it obeys no master; it is " omnipotent." But in a constitutional republic, where the acts of the officers of State are valid or invalid, as they obey or disobey the fundamental law, and where the doctrine of accounta-

bility, *respondeat ad superiorem*, is enforced to the letter, it is strange doctrine.

If the sovereign intended that the acts of the legislature should be unquestioned, unassailable, except as approved, why are the powers conferred limited and details of legislation in some instances prescribed? The only unlimited power possessed by the legislature is in art. iv, § 14, providing that it *may* make its own rules and punish its members. In all others the mandatory "shall" is used.

It is provided that there shall be proceedings entered upon their *journals*, and that these journals shall be deposited in the office of the secretary of state, and immediately upon adjournment are published. Code 1880, §§ 177, 178; Const., art. iv, §§ 14, 24, and 31.

These journals contain the history of the legislation, and by these sections of the constitution are necessarily evidence of the matters required by the constitution to be there recorded.

In cases of bills vetoed by the governor, under § 24, art. iv, the sole evidence of the passage of the law is the journals of the two houses.

What chaos would fill legislation if the houses had no journals!—if those journals were destroyed! To test the necessity of journals, suppose they were not kept, could the passage of a vetoed bill ever be established? Could a constitutional appropriation of money ever be shown?

As before stated, there must be evidence of some character, outside of the face of the enrolled bill, by which the judge can determine whether the act has been passed in the mode and within the limits prescribed by the constitution. That evidence must be certain, or as certain as the nature of the case permits. It should not be parol evidence.

The constitution, art. iv, § 23, provides as follows: "And *every bill having passed* both houses shall be signed by the president of the senate and the speaker of the house of representatives in open session." And § 24, "Every bill which *has passed both houses*, shall be presented to the governor," etc.

The judiciary, to determine whether an alleged statute is a law, must find as a fact that the alleged statute *passed both houses* and was signed in open session, and that the bill " which has passed both houses " is the one approved.

These are necessary elements in a valid statute. They are required by the constitution. The court must find as a fact that the identical bill as passed was approved. *These facts must exist to make the statute valid.* Upon what evidence is this to be based? We admit that *prima facie* the officers in charge did their duty, and that the signatures to the bill would, *prima facie,* show that the bill passed both houses, was signed in open session, and that the bill as approved was the bill as passed.

The basis of this *prima facie* case is, as stated, the *presumption* in favor of official acts. This presumption could only be overthrown by *affirmative* evidence. That it imparts absolute verity we deny. A presumption cannot impart absolute verity if the fact, by competent evidence, appears to the contrary. Nor if the record was a forgery, or the judgment procured by fraud.

Justice Handy, in *Green* v. *Weller,* 32 Miss., fell into error in this; he declared that the acts of the legislature as enrolled, like acts of parliament, were records and imparted absolute verity. To illustrate this, he infelicitously took as an example the records of courts. It is true that the judgment of courts having jurisdiction are presumed to be correct. *Omnia presumitur rite esse acta.* But it is not true that where the record affirmatively shows that the recitals are untrue the presumption must continue.

In *Hunt* v. *State,* 60 Miss. 580, the record affirmatively showed that only eleven men composed the jury, and it was held *incurable by consent* or by the judgment.

Though a judgment imports the existence of jurisdiction, if the fact affirmatively appears by the record to the contrary the presumption is overthrown.

If the judgment be a forgery, if it has been procured by fraudulent misrepresentation to the court, it would be void. There would not be " due process of law."

But it is the whole record and not the judgment alone that must

be considered. As a whole the record does impart verity; that is, that the facts therein stated are true. Besides, to say that the record imparts verity, that is, it cannot be contradicted, is not to give that solemnity to *a part of the record*. The whole record of an act of the legislature is the progressive steps in the journal to the final enrollment of the bill and its approval. The enrolled bill is but a certificate of the officers of both houses of the action had. If we say that the enrolled bill is the record, we assign to the reported or certified doings of the houses a greater solemnity than to the journals, which contain the history of the acts themselves. We make copies better than originals; hearsay better than original evidence. The enrolled bill is not the record of what has been enacted. The record is on the journals. The enrolled bill purports to be a copy of the act as passed.

Thus, if we liken the acts to records we must have the whole record and not certified conclusions therefrom. By the whole record it affirmatively appears that the enrolled bill, the certified doings of the houses, is not correct. Hence, tested by the doctrine of court records, it cannot stand. *Hunt* v. *State*, 60 Miss., *supra*.

The evidence, then, upon which the judiciary must act is the enrolled bill and the journals, as being the best evidence the nature of the case admits. And such is the great weight of authority. The earlier cases, it is true, followed the declarations of the English courts as to records, but the later cases are to the contrary.

The doctrine of the Supreme Court of the United States is that the judiciary must declare what is the law, and the journals should be examined. *Gardner* v. *Collector*, 6 Wall. 499; *Town* v. *Perkins*, 94 U. S. 261. In this case there is a dissenting opinion, not on this point, however, but upon the point whether in Illinois the existence of the law was one of fact or law. *Post* v. *Supervisors*, 105 U. S. 668, affirming the majority opinion in 94 U. S. 261, *supra*.

To the same effect are *Skinner* v. *Denning*, 2 Ind. 558; (4 Hill N. Y.) 384; *Smithee* v. *Garth*, 33 Ark. 17; *Hull* v. *Miller*, 4 Neb. 503; *Williams* v. *State*, 39 Tenn. 549; *Supervisors* v. *Heman*, 2 Minn. 330; *Coleman* v. *Dobbins*, 8 Ind. 156; *In re Roberts*, 5

Colorado 525; *Legg* v. *Mayer*, 42 Md. 203; *State* v. *Platt*, 2 S.
C. 150; *Walker* v. *State*, 12 Ind. 200; 13 Ind. 46; 71 Mo. 266;
14 Ill. 297; 19 Ill. 324; 35 Ill. 121; *Weill* v. *Kenfield*, 54 Cal.
111; *Bradley* v. *West*, 60 Mo. 33; *People* v. *Mahoney*, 13 Mich.
481; *People* v. *Supervisors*, 16 Mich. 254; *State* v. *Francis*, 26
Kansas 724; *Railroad Tax Cases*, 13 Fed. Rep. 722; *Jones* v.
*Hutchinson*, 43 Ala. 721; *Southwark Bk.* v. *Commonwealth*, 26 Pa.
St. 446; *State* v. *Gould*, 31 Minn. 189; *Koehler* v. *Iowa*, 60
Iowa 543; *Bound* v. *R. R. Co.*, 45 Wis. 558; *Fordyce* v. *Goodman*,
20 Ohio St. 1.

. The case of *State* v. *McBride*, 4 Mo. 303, holding our view, was
overruled by *Pacific* v. *Governor*, 23 Mo. 362, which in turn was
overruled by *Bradley* v. *West*, 60 Mo., and *State* v. *Mead*, 71 Mo.
266, *supra;* and this State rests for our view.

Earlier California cases were overruled by *Weill* v. *Kenfield*, 54
Cal. 111, *supra*.

Earlier cases in Maryland were overruled by *Berry* v. *Baltimore*,
41 Md. 446, and *Legg* v. *Mayer*, 42 Md. 203, *supra*.

In *Green* v. *Weller*, 32 Miss. 650, cited as sustaining the oppo-
site view, the opinion of Judge Handy is written in the *first person*.
Chief Justice Smith there dissented, and Judge Fisher concurred
in the result reached, but *did not concur in the view of Judge
Handy on the point now under consideration*. On this point he
concurred with Smith, C. J. *See Appendix* 4 *G*. So the authority
is really for us. *Swan* v. *Buck*, 40 Miss. 296, cites *Green* v. *Weller*
as holding Judge Handy's view, but the question was not involved
directly in *Swan* v. *Buck, supra*.

In *Brady* v. *West*, 50 Miss. 78, Judge Peyton, after a careful
review of the cases, declares that the views of Judge Handy cannot
be upheld, and holds that the journals may be examined.

We submit that the authorities here presented show that the
constitutional and statutory requirements as to keeping journals
and reading them daily mean something. They either mean some-
thing or they mean nothing, and, if something, it was designed
that they be a record. Human ingenuity can conceive of no other
purpose of the incorporation of those provisions. If they are

designed to be a record, it seems to us it must necessarily follow that it was designed that they should be a record for resort to ascertain whether or not the bill was passed; that they import absolute verity, and are the very highest evidence of the legislative intent and action. These journals are ordained as contemporaneous, record evidence of what the legislature does.

The question is asked, What is to become of our theory if the minutes are silent on the subject of the act? We say, in such case, the enrolled act is *prima facie* the law; and we do not think it will vitiate the law if the journals merely fail to show the reading of the act on three several days, as everything will be presumed to have been done which ought to have been done to make the bill a law.

There must be some means in the constitution of the country by which the blunders of petty clerks may be prevented from becoming the solemn laws of the land. There must be some means by which solemn constitutional enactments may be given force, by which forgeries may be declared to be forgeries.

Let the court imagine a forged bill, which had passed the scrutiny of the speaker, president, and governor. Is it possible this court will say, in this free, constitutional government, that it has not the power to declare that forgery, and that, so far from it, it is compelled to say that the speaker of the house of representatives and the president of the senate, and the governor of the State may make laws. The only escape from this conclusion is to let the journals of the two houses, the public record of their transactions, be conclusive evidence of the legislative intent. It is these journals which record the solemn history of the action of the two houses; and, in order that there may be no mistake about the correctness of this record, it is provided that they shall be read over in the hearing of the respective houses, and thus they become, in our judgment, the record of such proceedings, and the very highest evidence of what those bodies did.

Our position is, that enrolling clerks cannot make laws, that governors and legislative officers cannot make them, and that the journals show who makes them.

*M. Green*, for the appellant, argued the case orally.

*W. P. & J. B. Harris*, on the same side.

The grave question here presented, as it stands in the jurisprudence of the United States, is this : On one side it is affirmed that the journals of the two houses may be consulted either by the courts on the ground that, being required to take judicial notice of what are the laws of the land, they may look at the journals, kept under a mandate of the constitution, as an authentic record of what the legislature did, or the courts may receive them as evidence if the issue of fact can be made ; that any court may, without calling for proof, if the question of enacted or not enacted can be raised where an authenticated act, or what purports to be an act, is found on file in the office of the secretary of state, inspect the journals to determine it, without an issue of fact; but that in whatever form the question arises the journals may be consulted, and if they plainly show that the pretended act did not receive the assent of the two houses, it must be held to be a nullity.

On the other side, the proposition is that when there appears an authenticated act, duly filed in the office of the secretary of state, the question of enacted or not enacted cannot arise. It is not a question about the matter sought to be proved, as to the manner of the act, nor the kind of evidence which may be received, because no proof can be received as to any matter touching it. It is not open to inquiry whether the enrolled act passed or not. That unless the journals are by positive law made evidence on such a question, they are of no more weight than any other fact or circumstance, as no fact or circumstance can be brought forward. Investigation is shut out.

The American cases which support this proposition are confessedly based on the rule in England, and that rule rests on the case of the *King* v. *Arundel*, Hobart 109. It is important to know the light in which the journals of parliament were viewed at that day, and the reasons for the estimate placed upon them. It was a private bill. The court did, in that case, inspect the journal, which was silent as to the action of the lords on an amendment to a bill. Said the court: "But, now, suppose the journal was very

full and perfect, yet it hath no power to satisfy, destroy, or weaken the act, which, being a high record, must be tried only by itself, *teste meipsum.* Now, journals are no records, but only 'remembrances' of forms of proceedings to the record. They are not of necessity, and have not always been. They are like the dockets of the prothonotaries (clerks of the court of king's bench and common pleas), or the particular of the king's patent."

The journals in the time of Coke and Hobart, therefore, were not necessary to be kept, and had not always been kept in practice.

The journal here is kept under a constitutional requirement and auxiliary legislation. It is authenticated by a public reader in the presence of the houses. It is published, and the original deposited where the enrolled acts are deposited. They are distributed to the same persons to whom the laws are distributed.

Whenever it can be ascertained from reliable evidence that by carelessness or design a spurious measure has been substituted for a real one, the courts must interfere for the protection of the people. So far from narrowing the sphere of this wise and healthy provision, a fundamental policy counsels us rather to extend it, otherwise fundamental principles of government and essential principles of the constitution, as well observed by Mr. Cooley, will take the character of a class of enactments called directory laws, to be obeyed or not, as the officer may see fit, there being no sanction by punishment or by avoidance. That this chief excellence of our American constitution shall be neutralized by an old common-law dogma about records is a conclusion which renders our constitutions formal, stilted nonsense.

Now, it is clear that our American constitutions are not part of the common law, nor can that law circumscribe or hamper them or place artificial barriers to the assertion of right by the people, though it may assist in interpreting them.

Our constitutions as a general rule require the two houses of the legislature to record in writing their daily proceedings. The existing constitution of Mississippi puts this requirement in language a little stronger, if it is correctly printed. It is in substance like that of New Hampshire: "They shall each pub-

lish from time to time a journal of its proceedings." In New Hampshire such language is held to be a command to keep a journal.

The doctrine of the indisputable character of the rolls of parliament had its origin when no journals were kept, and grew up under the absolute subservience of the judiciary, which regarded itself as forbidden to examine into the conduct of parliament. It would be an unpardonable weakness in our courts, occupying the position assigned to them by the constitution, to circumscribe their sphere by setting up a worn-out doctrine of the common law in order to compel the people to submit to burdens which their representatives never imposed. Is it not competent for us to create a record ?

No statute declares that the enrolled acts shall be evidence, nor that the journals shall be evidence, yet they are both dealt with in the same way. True, the acts are signed by the presiding officers of the two houses, but for aught that appears this authentication is intended to assure the governor of the passage of a bill which he is expected to sign without examining the journals.

The reading over of the journals each day in the presence of the houses is the highest kind of authentication. It is required by positive law. While each of the two houses may suspend their rules, it may be fairly questioned, nay, denied, whether they can separately suspend a positive law or any explicit requirement of law. Whatever the practice may be, it is plainly against the law to omit the duty.

We concede that on the question whether a particular enrolled act did pass, did, in fact, become a law by the consent of the two houses, some test should be final, and that test ought to have the character of an authentic official record, but we see no public policy which would exclude the journals which possess this character.

The courts of Illinois, Indiana, Michigan, Minnesota, New Hampshire, South Carolina, Alabama, Pennsylvania, West Virginia, have all ventured to consult the journals as to the passage of acts, and have held the journals, where they speak, to be decisive,

and yet no one can say that in these States there is any trouble, or that the condition of New Jersey is the better for selecting the enrolled act as the final and indisputable test.

The mischiefs are purely imaginary. We cite here very many cases in support of the admissibility of the journals as information to a court taking judicial notice, or as evidence : *Gardner* v. *Collector*, 6 Wall. 511 ; *Town of Ottawa* v. *Perkins*, 94 U. S. 261 ; *Spingler* v. *Jacoby*, 14 Ill. 297 ; *Jones* v. *Hutchinson*, 43 Ala. 721 ; *Moody* v. *State*, 48 Ala. 115 ; *People* v. *Hatch*, 19 Ill. 283 ; 44 Ind. 446 ; 15 West Va. 85–90; 19 Ark. 250 ; 2 S. C. (N. S.) 150 ; 26 Pa. 446, 450 ; 35 N. H. 579; 13 Mich. 481, 492; 2 Minn. 330.

To these cases we add the case of *Brady* v. *West*, 50 Miss. 78, the last utterance of this court on the subject, and Cooley Const. Lim., last edition, 163.

We insist that it is now the adjudged law of this State that the enrolled act in the office of the secretary of state is only *prima facie* evidence that the act was enacted and that the journals may be consulted, and if from the journal it appears that the act did not pass, it must on that evidence be declared void,

*W. P. Harris,* of counsel for the appellant, made an oral argument.

*T. M. Miller,* Attorney General, for the State.

The provisions of our constitution necessary to be considered are, 1. Section 23, article iv ; § 24, article iv ; § 14, article iv. This court is called upon to determine which shall stand as an authoritative announcement of the law upon the questions submitted ; the decision of the high court of errors and appeals in *Green* v. *Weller*, 32 Miss. 68, or the later decision of the supreme court in *Brady* v. *West*, 50 Miss.

I maintain that the opinion of the court in *Brady* v. *West* is entitled to little consideration so far as it relates to the question here presented, because it gave no consideration whatever to the essential principle involved. While quoting some authorities (writers and judges) usually deemed respectable, the opinion on this question stands as a mere mass of assertions.

If true that the constitution intended that legislation should depend for its existence upon the entry in the journal of every fact essential to its passage, then nothing can be presumed for or against the action of the legislature. Every act of every nature must depend on the journal. The idea suggests an exodus.

But the question to which the court closed its eyes in the later case, the real question, was this: Was the common law of England, in so far as it related to the effect given as evidence (*teste meipso*) to parliament rolls adopted as part of the law of this State, or was that feature of it (in view of our written constitution, restricting the lawmaking power itself in so many particulars) inapplicable to our circumstances and condition?

That was the question grappled and decided in *Green* v. *Weller*, and in a number of splendid opinions in other States holding the same views, and which, in my humble judgment, are not successfully met anywhere. I refer to such cases as *State* v. *Young*, 32 N. J. 29; *Sherman* v. *Storey*, 30 Cal., overruling a favorite if not leading case on the other side in 2 Cal. 165, *Fowler* v. *Pierce; Pacific R. R.* v. *Governor*, 23 Mo. 353.

If it be admitted or established that the common law respecting enrolled bills became a part of our law, then the appellee's case is won, because nothing is more certain than that, according to the common law, an enrolled bill was the highest record. It imparted an absolute verity, as did the judgment of a court of general jurisdiction. It would follow, therefore, that any decision denying such an effect was a judicial repeal of the law of the land, and should itself be repealed or set aside.

It does seem that the argument that State legislatures differ so widely from the English parliament that their enrolled bills should stand upon a different footing as evidence, should be considered to have spent its whole force on the high court of error and appeals in the case of *Green* v. *Weller, supra,* for this simple, yet, to our mind, controlling reason, viz.: Before that decision it was a mooted question in this State. On the one hand, it was claimed that the people, having adopted a constitution, and being presumed to know the law, custom, and usage in such matters, and that, according to

such law, custom, and usage, a bill duly certified and enrolled with
the proper custodian of records imported absolute verity, could
only be tried by itself, and having failed to provide against such
a consequence, must be deemed to have assented to it.   On the other
hand, it was claimed that, whereas, of their own motion, only the
houses of parliament kept a journal, which was confessedly inferior
in dignity as a record to the enrolled bill; that acts of parliament
were promulgated by an uncontrollable body whose proceedings
could not therefore be inquired into; and whereas State legisla-
tures were merely servants of the people, subject to limitations in
the organic law, supervisable, so to speak, by the courts, and
required to keep a journal in which their proceedings should be
entered, they could not, therefore, make a record of greater
dignity than their journals.   Consequently it was claimed the
courts could at all times go behind the duly enrolled bill, and look
into the journals to see if constitutional directions had been fol-
lowed in all particulars, and discovering a departure, should
promptly declare the act void.

Not now considering the intrinsic merit of the decision, the
court in the case referred to put an end to the controversy by declar-
ing that the common law, with the incidents and in the particu-
lar stated, had been adopted into our system.

But that is not all.   The people again met in convention, this
time with an undoubted knowledge of the state of the law in that
regard (the Appendix to 4 George to the contrary notwithstand-
ing), framed and afterward adopted a new constitution not differ-
ing from the old, so far as the subject under consideration is
concerned, except in one particular as above set out, viz.: by
requiring the heads of the two houses to sign bills which have
passed in open session.

This must strike the impartial mind as a recognition of the idea
that there must be constituted somewhere an authority to promul-
gate, to authenticate finally and conclusively the action of the
legislature.   It was then understood that the speaker of the house
and president of the senate were clothed with that power.   To
guard against abuse, to some extent at least, they were required to

perform this duty before the eyes of the members of their several houses.

So that, whatever may be said of the law in other States (while I maintain that the weight of authority supports the earlier decision here), in Mississippi it is clear that the common law was adopted by her people. Hence the enrolled bill authenticated by the proper authority, approved by the governor, and filed as required by law, imports absolute verity; and in case of conflict, therefore, with the journals, the latter must yield.

It is a fact within the knowledge of all, that except on rare occasion, when the journal is appealed to and corrected, the clerk (who may be stupid, careless, or ignorant) is an autocrat, undisputed master of that record.

I may admit here, for the sake of the argument, the tendency of the later decisions is to maintain that when the constitution expressly requires a yea and nay vote to be taken on the passage of a bill, and to be entered on the journal, that becomes of the essence of its validity and may be inquired into, but that admission does not involve the power of a court to look behind the enrolled bill to inquire into a matter which the constitution has not expressly required shall be spread upon the journals.

If that were true "the inquiry may be extended to good· as well as to bad laws, to those passed as well with the approval of the governor, as to those which are passed his objection to the contrary notwithstanding.　＊　＊　＊　＊　And thus statutes constitutional on their face, regular in their terms, which may have been the rules of action for years, and under which large amounts of property have been vested and numerous titles taken, may be abrogated and declared void. A principle with such a consequence should be supported by a weight of authority which no court can resist.　＊　＊　＊　＊

"The required forms may be observed and the clerks may fail to make the necessary or correct entry. If the journals had been designed as the evidence in the last resort　＊　＊　＊　＊　would not some method have been adopted by which greater care would have been exacted in entering the proceedings of the two houses?

" In that country, from which we borrow so many of our ideas respecting government and laws, and whose common law and early statutes constitute the substratum of all our systems of jurisprudence, the statute roll is the only and the exclusive evidence of what the statute law is, so long as it is in existence. Then it is maintained that if the journal were every way full and perfect, yet it hath no power to satisfy, destroy, or weaken the act, which, being a high record, must be tried only by itself—*teste meipso.*"

These quotations are from the opinion of Scott, J., in *Pacific R. R. Co.* v. *Governor, supra,* and in their essence are strangely like the language and reasoning of Judge Handy.

What will be said of the case where the journal itself fails to show its full meaning? Will the court go still further—outside the journal—and dig up if practicable the mangled remains of an original bill having thirty or forty amendments tacked to it?—some we will suppose adopted (by number) and others rejected; a bill in which changes might have been made at any time before its passage, and that, too, without a word necessarily appearing on the journal?

In spite of the use of the words, " or other sources of information," appearing in a wanton text-book and some opinions, I think no argument is needed to show that the court would not undertake such an experiment as that. Every principle of safety and all cases worthy to be noticed forbid the attempt.

What is the result? An apparent conflict has been made to arise between the promulgated act and the senate memorial. Who will say it is real? Who will say what that part of the supposed original bill ending or contained on " line 410 " had relation to? Who will say the supposed amendment had any meaning whatever or would have amounted to anything more than the pleasantry sometimes indulged in by statesmen even? Who will say that there were four hundred and ten lines in the bill? No admission of parties can make laws for the State, and it was not intended that I should be estopped to deny the sufficiency of the proceedings relied on to destroy the State's revenue bill.

Whatever may be said of the accuracy or pertinency of the

ancient declaration that "when the bill is passed the journal is expired," it is perfectly certain that the court will not, over an enrolled bill and to support a journal entry (possibly made for the purpose) that might destroy it, go into the "jumbled" original bill and call experts to explain and straighten it. If it will not do this, then the amendment here insisted upon must be disregarded—that is, the court will decline to receive evidence which must chance its support in turn upon a paper that needs to be identified and explained.

For the position taken, that the enrolled act must prevail over the journals, I rely on the following decisions : *Green* v. *Weller*, 32 Miss. 650 ; *Swan* v. *Buck*, 40 Ib. 218 ; *Fouke* v. *Fleming*, 13 Md. 392; *Sherman* v. *Storey*, 30 Cal. 253 ; overruling *Pierce* v. ——, 2 Cal.; *People* v. *Burt*, 43 Cal. 560 ; *La. Lottery Co.* v. *Richoux*, 23 La. An. 743 ; *Pacific R. R. Co.* v. *Governor*, 23 Mo. 353; *Clare* v. *State*, 5 Iowa 510 ; *Duncombe* v. *Pringle*, 12 Ib. 1 ; *Brodnax* v. *Groom*, 64 N. C. 244 ; *Eld* v. *Graham*, 20 Conn. 16 ; *Pangborn* v. *Young*, 32 N. J. 29 ; *State* v. *Swift*, 10 Nev. 176 ; *Evans* v. *Brown*, 30 Ind. 514 ; note to *Coleman* v. *Dobbins*, 8 Ind. 156.

*T. M. Miller*, Attorney General, also made an oral argument.

Campbell, J., delivered the opinion of the court.

The right of the sheriff of Hinds County to detain the petitioner depends upon the validity of " An act to amend §§ 557 and 585, Code of 1880, so as to increase the public revenue, and provide for the faithful collection of the same," approved March 18, 1886, and published by authority as a law. Its validity as a law is assailed on the ground that, while it was signed by the president of the senate and the speaker of the house of representatives and by the governor, it is not to be accepted as a law, because by reference to the journals of the senate and house it appears that a bill with the title of the foregoing act was introduced in the house and passed and sent to the senate, which passed it with thirty-seven amendments, of which that numbered 34 related to that part of the bill which imposed the tax for the non-payment of which

petitioner was arrested, and materially altered it, and that the bill was amended in other particulars by the senate and returned to the house, which concurred in these amendments, but the act as approved by the governor does not contain said amendment 34 and said other amendment particularly mentioned, but wholly omits both ; wherefore it is alleged that the bill signed by the governor was not passed by both houses, and, therefore, is not a law, or if a law in part, is not as to the part under which the petitioner is detained.

The question thus presented is not whether the journals of the senate and house of representatives are evidence, and may be resorted to as such in some cases and for some purposes; or whether the approval and signing by the governor of an act which was not passed by both houses would give it the force of law ; or whether an alteration of an act passed by both houses and signed by the governor, after such signing, would affect it.

The precise question for decision is this : Is an act signed by the governor, after having been signed by the president of the senate and the speaker of the house of representatives in attestation of the fact that it had passed both houses, the sole evidence of its contents as passed by both houses, or 'may 'resort be had to the journals or either to determine whether the bill as signed by the president of the senate and speaker of the house contains amendments which appear to have been adopted? in other words, whether the bill as signed by the presiding officers is that which was passed by both houses.

It is not questioned that a bill entitled as above passed both houses, and the dispute is whether the two houses consented to precisely the same provisions. It is a question as to the contents and provisions of the bill.

There is great diversity of opinion on the general subject to which this question relates.

One view is that the legislature can act only as authorized by the constitution, and that the journals must show affirmatively conformity to the requirements of the constitution in the progress of a bill through its several stages to become a law, or else that it is not a law, and is to be so declared and treated by the courts.

Another is that mere silence of the journals as to those matters not required by the constitution to be entered on them will not invalidate a bill passed by both houses, but a presumption will be indulged in favor of conformity to the constitution and the act will be upheld on that presumption; but if the constitution requires the entry on the journals of certain things, and they are not shown by the journals, or if the journals affirmatively show a failure to observe these provisions of the constitution which relate to the passing of bills, but are not required to be entered on the journals, the bill will not become a law.

A third view is that the enrolled act signed by the president of the senate and the speaker of the house of representatives and the governor is the sole expositor of its contents and the conclusive evidence of its existence according to its purport, and that it is not allowable to look further to discover the history of the act or ascertain its provisions.

There may be modifications of these several views, but they embrace substantially the different rules announced on this much mooted subject.

The first-mentioned has but feeble support. Its absurdity is so manifest as to have found few advocates. It degrades the legislature below the level of an inferior court of special and limited jurisdiction, and demands that its daily record of proceedings shall affirmatively show the existence of all those facts and conditions on which its power to act depends, and indulges no presumption in favor of its proper action, even as to matters over which its power to act is undoubted.

This view appears to have obtained a firm footing in Illinois, founded on a change in the constitution which was held to make that rule proper. As formulated in *Barnes* v. *Starnes*, 35 Ill. 121, the doctrine is that, " when a bill has become a law, there must be record evidence of every material requirement from its introduction until it becomes a law. And this evidence is found upon the journals of the two houses." Similar utterances have been made elsewhere. It is evident that able judges in Illinois have been dissatisfied with the rule in that State. In the case just mentioned

it is said, "Were it not for the somewhat peculiar provision of our constitution, which requires that all bills, before they can become laws, shall be read three several times in each house, and shall be passed by a vote of a majority of all the members elect, a bill thus signed and approved would be conclusive of its validity and binding force as a law." It was also said, "We are not, however, prepared to say that a different rule might not have subserved the public interest equally well, leaving the legislature and the executive to guard the public interest in this regard or to become responsible for its neglect."

The second view mentioned has considerable support. There is a quite general concurrence in the proposition that mere silence of the journals as to those steps in the progress of a bill through the two houses, not required by the constitution to be entered on the journals, will not invalidate a bill, which, in such case, will be presumed to have been passed in conformity to the constitution ; but among the courts holding to this second view there is not complete accord as to when the failure of the journals to show entries required by the constitution to be made on them will invalidate an act of the legislature ; nor is there harmony as to the scope of judicial vision beyond the enrolled act in the effort to ascertain the law.

This view puts the legislature on the footing of an inferior tribunal, with special authority to act in a prescribed state of case and manner, and presumes in favor of the regularity of its action in cases in which its action is not required to be shown by its record, and against it as to matters required to be of record on its journal, and decides against its action in the absence of such record evidence, as well as where its record shows affirmatively non-compliance with directions of the constitution as to the mode of exercising legislative power. This view is supported by *Jones* v. *Hutchinson*, 43 Ala. 721 ; *Moody* v. *The State*, 48 Ala. 115 ; *Walter* v. *Griffith*, 70 Ala. 361 ; *Worthen* v. *Badget*, 32 Ark. 496 ; *Smithee* v. *Garth*, 33 Ark. 17 ; *Weill* v. *Kenfield*, 54 Cal. 111 ; *In re Roberts*, 5 Col. 525 ; *McCulloch* v. *The State*, 11 Ind. 424 ; *Berry* v. *R. R. Co.*, 41 Md. 446 ; *Legg* v. *Mayor*, 42 Md. 203 ;

*Supervisors* v. *Heenan,* 2 Minn. 330 ; *State* v. *Hastings,* 24 Minn. 78 ; *State* v. *Mead,* 71 Mo. 266 ; *Hull* v. *Miller,* 4 Neb. 503 ; Judicial Opinion, 35 N. H. 579 ; Judicial Opinion, 52 N. H. 622 ; *Fordyce* v. *Godman,* 20 Ohio St. 1 ; *State* v. *Platt,* 2 S. C. 150 ; *State* v. *Hagood,* 13 S. C. 46 ; *Osbourne* v. *Staley,* 5 W. Va. 85.

The precise question in the case cited from 70 Ala. is whether the absence of an affirmative showing by the journals of matters not required by the constitution to be entered on them invalidated an act signed by the presiding officers of the two houses and the governor, and it was decided in the negative. No reference is made by the court in that case to the cases in 43 and 48 Ala., respectively, or either of them, and it does not appear how that learned court will decide the question now before us. We admit that the cases in 43 Ala. and 48 Ib. are against our view, but they appear not to have commanded sufficient respect at home to have been cited in the case in 70 Ala.

The case in 54 Cal. 111 makes no mention of the case in 30 Cal., in which the contrary doctrine is held, and contains no satisfactory reason for the conclusion reached.

The cases in 41 and 42 Maryland are peculiar, and when considered in connection with *Fouke* v. *Fleming,* 13 Md. 392, and *Mayor* v. *Harwood,* 32 Md. 471, cannot be considered as putting Maryland among the States whose courts permit the enrolled act of the legislature to be overthrown by the journals. In the latest case cited the court said : " Nor do we decide in this case that the journals of the two houses, though required by the constitution to be kept as records of their proceedings, would be evidence *per se* upon which the validity of a statute having the required authentication could be successfully questioned as to the manner of its enactments. But we think the journals, in connection with other competent evidence upon the subject, may be examined as means of information to aid in arriving at a correct conclusion as to what was the action of the legislature on any particular bill before it."

It is observable also that the constitution of Maryland expressly requires that every bill shall be " actually *engrossed* for a third reading," and the code of that State declares the journals evidence.

In both the Minnesota cases the acts of the legislature were upheld. The case in 11 Ind. was overruled by *Evans* v. *Browne*, 30 Ind. 514. The decision reported in 20 Ohio St., *supra*, is rested on *Miller* v. *State*, 3 Ohio St. 475, the opinion in which by Thurman, C. J., we submit, strongly supports our view.

*State* v. *Platt*, 2 S. C., was decided by a divided court, and the dissenting opinion is far more satisfactory than that of the majority of the court. In *State* v. *Hagood*, 13 S. C., the doctrine of the former case was followed in deference to *stare decisis*, but an able opinion shows the error of the former ruling.

The third view mentioned above meets our unqualified approval, because it is the simplest, the surest to avoid errors and difficulties, in accord with the constitution, and supported by an array of authority and a cogency of argument that commands our fullest assent. Every other view *subordinates* the legislature and disregards that coequal position in our system of the three departments of government. If the validity of every act published as law is to be tested by examining its history, as shown by the journals of the two houses of the legislature, there will be an amount of litigation, difficulty, and painful uncertainty appalling in its contemplation and multiplying a hundred fold the alleged uncertainty of the law. Every suit before every court where the validity of a statute may be called in question as affecting the right of a litigant will be in the nature of an appeal or writ of error or bill of review for errors apparent on the face of the legislative records, and the journals must be explored to determine if some contradiction does not exist between the journals and the bill signed by the presiding officers of the two houses. What is the law is to be declared by the court. It must inform itself as best it can what is the law. If it may go beyond the enrolled and signed bill and try its validity by the record contained in the journals, it must perform this task as often as called on, and every court must do it. A justice of the peace must do it, for he has as much right and is as much bound to preserve the constitution and declare and apply the law as any other court, and we will have the spectacle of examination of journals by justices of the peace and statutes declared to be not law as the

result of their journalistic history, and the circuit and chancery courts will be constantly engaged in like manner, and this court will, on appeal, have often to try the correctness of the determination of the court below as to the conclusion to be drawn from the legislative journals on the inquiry as to the validity of statutes thus tested. It is difficult enough often to say what an admitted statute means, and while we would not shrink from the investigation of all questions of fact on the existence of which any statute depends, we decline to review the legislative records to try the regularity of its action as to the manner of exercising its constitutional authority to enact laws, over which its power is as plenary as that of this court as to the manner in which it shall exercise its jurisdiction.

The rule which we announce as the correct one is supported by *Sherman* v. *Story*, 30 California 253 ; *People* v. *Burt*, 43 California 560 ; *Evans* v. *Browne*, 30 Indiana 514 ; *Koehler* v. *Hill*, 60 Iowa 543 ; *Company* v. *Richoux*, 23 La. An. 743 ; *Mayor* v. *Harwood*, 32 Md. 471 ; *Railroad Co.* v. *Governor*, 23 Mo. 353 ; *Swann* v. *Buck*, 40 Miss. 268 ; *State* v. *Swift*, 10 Nevada 176 ; *Pangborn* v. *Young*, 32 N. J. Law 29 ; *People* v. *Devlin*, 33 N. Y. 269 ; *Brodnax* v. *Groom*, 64 N. C. 244.

There are other cases supporting the opposite views, but we have cited the most important on both sides.

The English rule is conceded to be that for which we contend.

The fundamental error of any view which permits an appeal to the journals to see if the constitution has been observed in the passage by both houses of their enactments, is the assumed right of the judicial department to revise and supervise the legislative as to the manner of its performance of its appointed constitutional functions. It is the admitted province of the courts to judge and declare if an act of the legislature violates the constitution, but this duty of the courts begins with the completed act of the legislature. It does not antedate it. The legislature is one of the three co-ordinate and co-equal departments into which the powers of government are divided by the constitution, possessing all legislative power and not subject to supervision and control during its performance of its constitutional functions, nor to judicial

revision afterward of the manner in which it obeyed the constitution its members are sworn to support. From necessity the judicial department must judge of the conformity of legislative acts to the constitution, but what are legislative acts must be determined by what are authenticated as such according to the constitution.

That instrument contains many provisions as to the passage of bills which are admitted to be addressed to legislators exclusively, and for non-observance of which there is confessedly no remedy which courts can apply. Why should a distinction be drawn between the different provisions of the constitution, and some be held *mandatory* and others *directory?* There is no reason for such a distinction, and it is the offspring of a necessity born of the error of regarding any of the provisions of the constitution addressed to and obligatory on the legislature as enforceable by the courts as supervisors of the legislature. The sound view, and that which avoids the inconsistency of the distinction mentioned, is to regard all of the provisions of the constitution as mandatory, and those regulating the legislative department as addressed to and mandatory to that body, and with which the courts have nothing to do in the way of revision of how the legislature has performed its duty in the matters confided exclusively to it by the constitution.

Let the courts accept as statutes, duly enacted, such bills as are delivered by the legislature as their acts authenticated as such in the prescribed mode.

The language of the constitution, § 23, art. iv, is : "Bills may originate in either house, * * *. and every bill shall be read on three different days in each house, unless, etc., * * * and every bill, having passed both houses, shall be signed by the president of the senate and the speaker of the house of representatives in open session."

"Section 24. Every bill which has passed both houses shall be presented to the governor of the State." Is it not manifest that the requirement that the bills which have passed both houses shall be signed by their presiding officers, in open session, was designed as an official attestation of the fact of such passage, and a solemn and unimpeachable authentication of the bills passed by

both houses, an assurance of their identity and of the fact that they had been passed by both houses, in the manner required by the constitution? Thus attested, every bill is to be presented to the governor. Must he search the journals to guard against a disregard by the legislature of the constitution as to the manner of legislating, and to avoid giving approval to an act passed without a due observance by the legislature of its provisions?

Is every person on whom the law operates to look beyond the enrolled act duly signed as required by the constitution, to see if the journal nullifies what appears by the act thus attested? The proposition is monstrous, and the recognition of such a doctrine is full of mischief, without any compensating advantage. But, it is said, the courts are guardians of the constitution, and if they do not look into the history of legislative doings that department may disregard the constitution as to the manner of passing laws. True, the courts are guardians of the constitution in the performance of their duty to decide causes, and should not shrink from declaring an act of the legislature enacted precisely in the mode prescribed by the constitution void if its provisions violate it; and, on the other hand, the courts should not arrogate the unconstitutional prerogative of reviewing and revising the course of legislative procedure in passing bills in the exercise of its clearly conferred right to pass them by virtue of an instrument containing injunctions binding on it, and sought to be enforced by the oath required of members, and not committed to the courts.

Undoubtedly the journals may be evidence, and may be resorted to in some cases, and must be as to some matters. They were properly looked to in *Gardner* v. *The Collector*, 6 Wallace 499, in the effort to fix the date of approval of a bill by the president. They must furnish the evidence that a bill returned by the governor without his signature and with his objections was so dealt with as to become a law, for it is only by the approval by two-thirds of both houses, determined by yeas and nays entered on the journal of each house, that such a bill can become a law, and as the constitution so provides, and has not prescribed any means of attesting or authenticating the concurrence of those requisites to

such a bill becoming a law, it rests, necessarily, on the journal, which must show that, although the bill was not signed by the governor but returned with objections, it nevertheless became a law according to the constitution.  The case is peculiar and extra-ordinary, and not governed by the rules applicable to the ordinary case where the governor signs the bill.  The provision for the signing of bills by the presiding officers does not apply here, and whether the bill on reconsideration became a law may depend on those things prescribed, and which cannot be shown except by the journals of both houses.  Had the constitution provided any means of authentication of such action by the two houses as to make a bill returned by the governor with his objections a law, it would have been exclusive, but in the absence of such provision the journals are the memorial of the action which converts a bill returned by the governor with his objections into a law.

The constitution provides for its amendment, and contains specific provisions on the subject.  The provision is that, " When-ever two-thirds of each branch of the legislature shall deem any change, alteration, or amendment necessary to this constitution, such proposed change, alteration, or amendment shall be read and passed by a two-thirds vote of each house respectively, on each day for three several days; public notice shall then be given," etc. This is aside from the ordinary business of legislation.  It is not legislation, it is a proposal by two-thirds of each house to amend the constitution.  It is not called a bill by the constitution, for a bill is a proposed law, and this is not.  This is a proposition, originated as provided, to the qualified electors for them to vote on.

It is not required to be signed by the president of the senate and the speaker of the house of representatives, for the provision on that subject relates to bills for the enactment of laws.  A pro-posed amendment to the constitution is not required to be presented to the governor.  He has nothing to do with a proposal to amend the constitution.  Only such bills are to be presented to him as he may make laws by approval and signing, or by not returning them.  This is unmistakably true, and yet in the case of *Green* v.

*Weller*, 32 Miss. 650, the plain distinction between the enactment of laws by passing bills, and proposing an amendment of the constitution was not adverted to.

The proposal to amend the constitution was spoken of as passing a bill, and stress was laid on its having been signed by the presiding officers of the two houses and by the governor. Certainly, their signing not being required by the constitution, had no virtue. As to a proposal to amend the constitution, the journals of the two houses are by the constitution made the only evidence of the proposal by the required number of each branch, and they should show what the constitution prescribes as to this.

In the case cited Judge Handy was clearly right on the general question as to the enrolled bill being conclusive evidence in the enactment of laws, but he was as clearly wrong in applying that wholesome rule to a proposal to amend the constitution; and Judge Smith was clearly wrong as to the rule as applied to laws, but right in claiming that the journals were to be looked to as the memorial of the proposed amendment to the constitution, if it was a question for the court to decide.

Were the question before us it is not improbable that we should concur in the view of Judge Fisher, as reported in the appendix of 33 Miss. Reports, and hold that the power to propose amendments of the constitution is confided to the legislature, and that it is a matter between the people and the legislature, and that there is no authority in the courts to revise the conjoint action of the legislature and the qualified electors. The question is political and not judicial, and for the determination of the *political* department of the government.

The case of *Green* v. *Weller, supra,* although by a divided court, was published as placing Mississippi in line with those who make the enrolled bill duly signed conclusive evidence of its existence and contents, and in the case of *Swann* v. *Buck,* 40 Miss. 268, the former case was cited, and the rule announced as settled in accordance with this view. This was then considered to be the settled doctrine in this State. In 1869 a new constitution was adopted in this State, and it contains substantially the provisions of the

former constitution in the particulars mentioned, without any change to indicate a new rule on the subject being considered. In *Brady* v. *West*, 50 Miss. 68, this court pronounced "an act to regulate the fees and salaries of public officers" void, because it was "evident from an inspection of the enrolled bill as signed by the governor and deposited in the office of secretary of state, that it was not the bill passed by the legislature," and the former doctrine in this State, and with reference to which it may be assumed the constitution was framed and adopted, was departed from, and views were announced which we regard as unsound and mischievous in their tendency. That case is now overruled. We decline to decide upon the guilt or innocence of the appellant, and remand him to the custody of the sheriff to be proceeded against as provided by law, when, upon the plea of not guilty, the question of guilt or innocence will be presented.

*Affirmed.*